## PEOPLE *v.* GIACALONE

1. SEARCHES AND SEIZURES—WITHOUT WARRANT—RESIDENCE—VALID ARREST.

    A contemporaneous search of a residence without a search warrant may be deemed lawful under some circumstances if it is incidental to a valid arrest.

2. SEARCHES AND SEIZURES—WITHOUT WARRANT—DANGEROUS WEAPONS—PROTECTION.

    Police officers may make a reasonable search for weapons when making an arrest to protect their own lives by exposing any dangerous weapons which might be concealed by the accused and used against the police officers.

3. SEARCHES AND SEIZURES—WITHOUT WARRANT—AFTER ARREST—REASONABLENESS—BEDROOM.

    Search of defendant's bedroom after police had arrested him pursuant to a valid arrest warrant was reasonable and incidental to the arrest when the defendant went to that area to get dressed, because that area became one under his immediate control.

4. SEARCHES AND SEIZURES—WITHOUT WARRANT—BEDROOM—DRESSER—BLACKJACK—REASONABLENESS.

    Search of defendant's dresser drawers which disclosed a blackjack was reasonably incident and contemporaneous with the

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 47 Am Jur, Searches and Seizures § 16.
[2, 3] 4 Am Jur 2d, Arrest §§ 31, 40.
[4] 4 Am Jur 2d, Arrest §§ 40, 73.
[5] 17 Am Jur 2d, Continuance §§ 3, 4, 27.
[6] 17 Am Jur 2d, Continuance § 36.
[7] 20 Am Jur 2d, Courts § 4.
[8] 53 Am Jur, Trial §§ 492–494.
[9] 53 Am Jur, Trial §§ 531–533.
[10, 11] 21 Am Jur 2d, Criminal Law §§ 564, 568.
[12] 56 Am Jur, Weapons and Firearms §§ 5, 9.

arrest, where the police had arrested the defendant, suggested that he get dressed, accompanied the defendant to his bedroom, and searched the dresser drawers before allowing him to get his clothes from them.

5. CRIMINAL LAW—CONTINUANCE—DISCRETION.

A continuance in a criminal case is a matter of discretion with the trial court, and the burden of proof is on the party claiming abuse of discretion to demonstrate it (CL 1948, § 768.2).

6. CRIMINAL LAW — CONTINUANCE — SUBSTITUTE COUNSEL — DISCRETION.

Trial court did not err in refusing a request for continuance on the grounds that the chief defense counsel was in the hospital for nonemergency diagnostic tests two days before trial when the request was made, where the defendant was represented by a team of lawyers who were familiar with the case, where he did not show that he was prejudiced by his trial counsel, and where he failed to argue that the substitute attorney was ineffective.

7. COURTS—STENOGRAPHERS—COUNTY EMPLOYEES.

Allowing stenographers who are not county employees to record a preliminary examination is harmless error, where no errors were alleged in the transcript and no prejudice is shown (MCLA § 766.11; CL 1948, § 769.28).

8. TRIAL—CRIMINAL LAW—ARGUMENT OF COUNSEL—RULES OF LAW.

Defense counsel cannot give a direct presentation of rules of law in order to prepare the jury for the judge's instructions, but may properly make references or allusions to the law in a closing argument.

9. CRIMINAL LAW—INSTRUCTIONS TO JURY—REQUEST TO CHARGE—JUDGE'S PHRASEOLOGY.

Failing to follow the wording of defendant's requested charge to jury is not error where the trial judge uses his own phraseology, but sufficiently instructs the jury as to the law.

10. CRIMINAL LAW—SENTENCING—PUBLIC RECORDS.

A trial judge may consult public records in determining sentencing.

11. CRIMINAL LAW—RIGHT OF REVIEW—PRESENTENCING REPORT.

Defense counsel does not have the right to review a presentencing report.

12. Weapons—Criminal Law—Blackjack—Statute.
    Statute making possession of a blackjack illegal is not unconstitutional (MCLA § 750.224).

Appeal from Wayne, Victor J. Baum, J. Submitted Division 1 January 12, 1970, at Detroit. (Dockett No. 6,971.) Decided April 16, 1970. Rehearing denied May 7, 1970. Leave to appeal denied May 26, 1970. See 383 Mich 786.

Vito Giacalone was convicted of possession of a blackjack. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Stewart H. Freeman,* Assistant Attorney General, for the people.

*Joseph W. Louisell,* for defendant.

Before: Danhof, P. J., and Fitzgerald and McGregor, JJ.

McGregor, J. At approximately six o'clock a.m. on May 14, 1968, nine police officers representing four law enforcement agencies, including Internal Revenue Service, arrived at the defendant's home and, pursuant to a valid arrest warrant, proceeded to arrest the defendant as one of the 14 persons charged in that warrant with conspiracy to commit extortion.

When he answered the door, defendant was clothed in a pair of "shorty" pajamas, a pair of slippers and a robe, and a prosthesis was attached to his leg. Defendant contends that the police officers ordered him to the bedroom to change his clothes since he was under arrest.

Defendant complied with these instructions, accompanied by several police officers. One of these officers testified that when the defendant approached a dresser to get some socks, an officer stopped him and searched the drawers before the defendant was allowed to open the dresser. This search of the dresser drawers by the police officer revealed a blackjack, for possession of which defendant was subsequently tried and convicted, MCLA § 750.224 (Stat Ann 1962 § 28.421), thus this appeal. Although other charges have stemmed from this search, *i.e.*, certain guns alleged to have been illegally possessed, those charges are not considered in this appeal.

Defendant alleges as error the denial of his pretrial motion to suppress, which motion was argued for six to seven days, as well as a number of other alleged errors which will be reviewed *seriatim.*

It is asserted that the lower court erred in denying defendant's motion to suppress the blackjack from evidence, in that the search of his home was an unreasonable one and thus was in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * * ."

Defendant does not directly attack the validity of the arrest warrant, but contends that this warrantless search was not truly incident to his arrest. He claims that the arrest was merely used as a subterfuge to legitimize and implement an otherwise impermissible search of the premises.

Under some circumstances, a contemporaneous search of a residence without a search warrant may be deemed lawful if it is incidental to a valid arrest.

*United States* v. *Rabinowitz* (1950), 339 US 56 (70 S Ct 430; 94 L Ed 653); *Harris* v. *United States* (1946), 331 US 145 (67 S Ct 1098; 91 L Ed 1399); *Agnello* v. *United States* (1925), 269 US 20 (46 S Ct 4; 70 L Ed 145, 51 ALR 409). When making an arrest, officers may make a reasonable search for weapons in order to prevent the accused's use thereof, and to protect their own lives by exposing any dangerous weapons which might be concealed by the accused and subject to use against the police officers. *Warden* v. *Hayden* (1967), 387 US 294 (87 S Ct 1642; 18 L Ed 2d 782); *Preston* v. *United States* (1964), 376 US 364 (84 S Ct 881; 11 L Ed 2d 777); *Agnello, supra.*

While conceding the propositions in the above-cited cases, it has been defendant's contention throughout the proceedings that the search in this case was not truly incidental to an arrest. He contends that under the present posture of the law, law enforcement agents may not use an arrest, legal or otherwise, as a subterfuge to make an otherwise impermissible search of one's premises. *Jones* v. *United States* (1958), 357 US 493 (78 S Ct 1253; 2 L Ed 2d 1514); *United States* v. *James* (CA6, 1967), 378 F2d 88.

In *Jones, supra,* the government, in prosecuting the defendant for various violations stemming from and including the possession of an unregistered still, attempted to use as evidence certain distilling equipment seized from the home of the defendant. The government maintained that their entry into the home was for the purpose of arresting the defendant and that, once inside the home, they could conduct an incidental search. The United States Supreme Court, in reversing the defendant's conviction, concluded that the testimony of the police officers established that their primary purpose in entering

was to search for distilling equipment and not to arrest.

In *James, supra,* the following language is contained, which aptly describes the situation therein:

"In the evening of September 26, 1963, approximately ten agents and police officers assembled at the Highland Park Police Station for the avowed purpose of planning the arrest of James and Mallory. They intended to search the apartment if an arrest was made. After making their plans, they descended *en masse* upon the apartment at 9:35 p.m., and one or two officers were assigned by Agent Miller to search each of the five rooms of the apartment. Mallory was not present but was arrested later. James was arrested in the dining room of the apartment, and the search was commenced in each of the five rooms and continued for one hour. The officers remained in the apartment for two and one-half hours. In a bedroom closet was found a vacuum cleaner which contained the narcotics.

"Taking into account all of the admitted facts and circumstances of the case, including the large aggregation of agents and police officers, it seems to us that the agents and officers were interested in something more than merely making an arrest. It is clear that their primary purpose was to make a general exploratory search of the apartment, with the hope of finding narcotics." *United States* v. *James, supra,* p 90.

Some additional facts will serve to illuminate and bring into sharper focus the events which transpired. Defendant alleges that, at the time of his arrest, he wanted to leave immediately; that he said, "Okay, I'm ready to go now," or words to that effect, to which the officer in charge allegedly replied that he did not want to go as he was considering the manner in which defendant was dressed. However,

defendant asserts that one of the officers made the statement that a search was going to be made of the defendant's bedroom, which statement was corroborated by another of the police officers:

"*Q. (Attorney for defendant)*: Lest I forget it, when Sgt. Mull said, 'There is going to be a search made of the subject's bedroom,' that was said in the presence of Mr. Giacalone, wasn't it?

"*A. (Police Officer Boffa)*: I believe so, but I don't know, I don't know if that's the exact words used.

"*Q. (Attorney for defendant)*: Well, that was the substance of it, 'There is a search going to be made of the bedroom'?

"*A.* That was my understanding, yes."

The lower court, in its opinion on the motion to suppress, concerning the testimony on this point, said:

"It is true that Sergeant Boffa, of the Sterling Heights Police Department, in his testimony supported the defendant's view that Mull [sergeant of the Michigan State Police] told the defendant that before they left there would have to be a search of the defendant's bedroom. But Boffa throughout seemed to have only vague impressions; he was easily led by a strong cross-examiner; his memory was not clear and certain on this point. On this particular subject, he is outnumbered and outweighed by the testimony of other witnesses.

"* * * The court finds that Mull's suggestion that Vito Giacalone change from bed clothes to street clothes was perfectly reasonable and proper; that it was a suggestion, not a directive or an order; that Vito Giacalone readily accepted it without any sense of duress or compulsion; that Mull's suggestion was made in good faith, without hidden or ulterior motive; and finally that Mull's suggestion about the defendant's attire was made without the

intention or purpose of enabling the police to search the bedroom or any other area. This finding is corroborated by the fact that the officers, upon entering the defendant's bedroom, did not immediately begin to search it, as will be seen."

Several officers, approximately three to five of them, accompanied defendant to the upstairs bedroom to dress; it was then, by word, gesture or overt act, that defendant indicated he wanted and intended to get some clothes out of a chest of drawers. After defendant's manifestation of such intention, one of the officers stopped him and searched the chest of drawers and found a small arsenal of weapons therein, including the blackjack.

Information given to the officers prior to this arrest indicated that there was a concealed safe beneath the bedroom closet floor. Upon the officers' request, the defendant opened the safe and its contents were inspected.

The search of the bedroom was followed by a thorough, nearly two-hour search of the house. Every room received at least a quick eye inspection, and certain rooms were inspected thoroughly and meticulously by expert searchers.

The obvious existence of another purpose on the part of the police officers, other than making an arrest and a search reasonably incident thereto, tends to becloud the arrest and its incidental search. Defendant has cited ample authority for this proposition.

The trial court's opinion aptly points out:

"The people's case would have been much clearer, cleaner, and easier if the police had not beclouded it with the possibility that there were purposes beyond the mere arrest of Vito Giacalone—purposes beneficial to the Internal Revenue Service and the Sterling Heights Police."

It is true that four of the officers who conducted this raid were representatives of the Internal Revenue Service, and two of the group were from the Sterling Heights Police Department, but they had nothing to do with the investigation of the extortion conspiracy. However, as the trial court correctly pointed out, the arrest crew acted under the direction and control of Sergeant Mull of the Michigan State Police.

In *United States* v. *James, supra,* the police failed to obtain an arrest warrant until more than three and one-half months after certain narcotics activity had allegedly occurred. There was no search warrant, and a raiding party of ten, including Federal agents and Detroit police officers, converged on the defendant's five-room apartment and searched it for two and one-half hours before finding some heroin hidden in a vacuum cleaner in the bedroom.

*James* is distinguishable for several reasons. Inasmuch as the arrest warrant therein was deemed invalid, there could be no search incident to a lawful arrest; there, the court ruled that the primary purpose was to make a general and exploratory search with the hope of finding narcotics. In the instant case, the lower court found, justifiably, that the primary purpose was to arrest the defendant for conspiracy to extort. Finally, here, the officers found offensive weapons of the type capable of inflicting great bodily harm on the officers.

In *Jones* v. *United States, supra,* no search was made incidental to the arrest. The police went to defendant's home looking for an unlicensed still; the search was completed an hour before the defendant arrived. Upon his return, he was arrested. There, the court was influenced by the fact that the officers had earlier obtained a daytime search warrant which they permitted to expire without use. Under the

circumstances, it was concluded that the predominant police motive was to search, not to arrest.

*Jones, supra,* and *James, supra,* and other cases cited by defendant point to the fact that, in order to vitiate an arrest on a valid warrant and a search incident thereto, the arrest must be proved to be a sham, or in effect, the primary purpose of such arrest must be to search rather than to arrest.

In considering the cases cited by defendant, there are common elements evident: first, the arrest must be in good faith; second, the arrest must be the primary purpose.

At most, evidence here showed a dual purpose. First and primarily, the police intended to arrest the defendant, and incidentally thereto, make a reasonable search of his person and of the area under his immediate control. When the defendant went to his bedroom to get dressed, that area became one under his immediate control. Secondly, the police intended to search other parts of his home. Had the latter purpose stood alone, obviously a different question would be presented here.

In *United States* v. *Rabinowitz, supra,* Federal authorities secured a warrant for selling stamps bearing forged overprints. The arrest occurred at the defendant's one-room office, at which time the officers searched the defendant's desk, safe, and filing cabinets for approximately one and one-half hours. The Supreme Court rejected the defendant's contention that stamps found during the search and admitted into evidence at trial had been illegally seized, and stated the general rule:

"[I]t seems never to have been questioned seriously that a limited search such as here conducted as incident to a lawful arrest was a reasonable search and therefore valid. It has been considered in the same pattern as search of the person after lawful

arrest.   What is a reasonable search is not to be
determined by any fixed formula.   The Constitution
does not define what are 'unreasonable' searches
and, regrettably, in our discipline we have no ready
litmus-paper test.   The recurring questions of the
reasonableness of searches must find resolution in
the facts and circumstances of each case.   (Citation
omitted.)   Reasonableness is in the first instance
for the district court to determine.   We think the
district court's conclusion that here the search and
the seizure were reasonable should be sustained
\* \* \* ."   *Rabinowitz, supra,* p 63.

The Court, in *Rabinowitz,* referred to *Harris* v.
*United States* (1946), 331 US 145 (67 S Ct 1098; 91
L Ed 1399), wherein the test of reasonableness was
discussed.   In *Harris,* the defendant was in exclu-
sive possession of a four-room apartment.   Five
FBI agents conducted a five-hour search of the four-
room apartment pursuant to an arrest warrant for
mail fraud and interstate transportation of a forged
check.   It can hardly be doubted that the arrest
alone, without a search, was not the sole purpose of
the officers.   Yet this search and the seizure which
took place at the end of the search were upheld,
even though the items seized were not related to the
charge stated in the arrest warrant.

The extent of what constitutes a reasonable search
was commented upon in *Harris,* 331 US 151 (67 S
Ct 1101; 91 L Ed 1405, 1406):

"The opinions of this Court have clearly recog-
nized that the search incident to arrest may, under
appropriate circumstances, extend beyond the per-
son of the one arrested to include the premises under
his immediate control."

In reviewing the facts herein, the police arrested
the defendant pursuant to a valid arrest warrant.
Certain of the officers reasonably suggested to the

defendant that he change his clothes, and the officers then accompanied the defendant to his bedroom. The defendant accepted this suggestion without any duress or sense of compulsion. It was not improper that the police accompany the defendant and search the dresser drawers before allowing entry thereto by the defendant. It was this search which disclosed the blackjack in question.

This Court recognizes the United States Supreme Court holding, in *Chimel* v. *California* (1969), 395 US 752 (89 S Ct 2034; 23 L Ed 2d 685), which stated that *Rabinowitz* is no longer to be followed and set forth a new standard, is not retroactive. *People* v. *Herrera* (1969), 19 Mich App 216, 231, 232; *United States* v. *Frazier* (D Md, 1969), 304 F Supp 467, 471. *Chimel* was decided on June 23, 1969; the search in the instant case took place on May 14, 1968.

This Court concludes that the arrest of the defendant was valid, that it was made in good faith, and was not a pretext or subterfuge; that the search of the dresser was reasonably incident to and contemporaneous with the arrest. The search uncovered weapons which were in the possession and under the immediate control of the defendant. The evidence was lawfully admitted.

Defendant next contends that the lower court erred in not granting his request for a continuance. CL 1948, § 768.2 (Stat Ann 1954 Rev § 28.1025), provides that the granting of a continuance lies within the discretion of the court. In *People* v. *Clark* (1968), 9 Mich App 602, our Court said that the burden is on the party claiming abuse of discretion to demonstrate it.

Trial of this case was set for November 14, 1968. On November 12, 1968, Mr. Neil Fink, an associate of the firm of Messieurs Louisell and Barris, informed the court that Mr. Louisell, who was chief

defense counsel in this case, was at the University of Michigan Hospital, and that one of his doctors had advised the need for more diagnostic tests. Because of this, a continuance was sought, but was denied by the trial judge.

A reading of the transcript reveals that Mr. Louisell was in the hospital for non-emergency diagnostic tests. The reason for the continuance was not for the benefit of the defendant, but rather for the convenience of Mr. Louisell and the doctor. Also, Mr. Louisell was cognizant of the approximate length of the trial (which in actuality lasted one day).

Defendant contends that he wanted Louisell at the trial to conduct his defense and merely condescended to representation by Barris and Fink because the court ordered trial to proceed as set. In this motion for continuance, defendant did not seek a different attorney, but merely indicated that he preferred Mr. Louisell.

In *United States* v. *Johnston and Balk* (CA6, 1963), 318 F2d 288, the defendant had retained counsel to defend himself; on a Friday before the trial date, scheduled for the following Tuesday, defendant learned that his counsel could not try his case since he was engaged elsewhere. The court ordered that the trial proceed with the partner of the original defense counsel representing the defendant, even though the defendant expressed disapproval of the plan and indicated his desire to retain other counsel in whom he had "confidence." The appellate court ruled that, in accordance with defendant's Sixth Amendment rights, a continuance should have been granted under the circumstances. We note, in *Balk,* that it was the defendant who was denied the opportunity to seek a new attorney after he learned that his original counsel could not attend

his trial. The request was made by the defendant, for a delay, in order to gain time to find a lawyer in whom he had confidence.

In the instant case, the defendant did not seek an adjournment for the purpose of finding new counsel. Defendant has not shown that he was prejudiced by his trial counsel, nor has he argued that the substitute attorney was in any way ineffective. The defense attorney at trial was familiar with the case and did not seek additional time in order to prepare for the one-day trial. It is also significant that, although Mr. Louisell was chief defense counsel for the defendant, Mr. Fink and Mr. Barris assisted him throughout the proceedings.

The trial judge correctly stated:

"Throughout these proceedings and related proceedings, the representation of Vito Giacalone has been a team effort. At various stages of the proceedings, Mr. Fink assisted Mr. Louisell in the trial of the Vito Giacalone cases. Neil Fink alone, without the presence of Mr. Louisell, tried a portion of the gun case [which also arose from the search of defendant's home] and made the closing argument to the jury. Neil Fink was present assisting Mr. Louisell throughout most, if not all, of the preliminary examination in the blackjack case. Likewise, Mr. Fink was present throughout much, if not all, of the extortion conspiracy preliminary examination. (The gun case being a misdemeanor, there was no preliminary examination.)

"Ivan Barris appeared for Vito Giacalone in the gun proceeding on October 14 and was heard in connection with both the gun and the blackjack cases with reference to assignment of both to one judge and with reference to consolidation.

"When the Vito Giacalone gun case was retried, after a hung jury, it is judicially noticed, subject to challenge, as above provided, that it was tried by Neil Fink. * * *

"The memorandum in support of the motion to suppress evidence is in the firm name and it is signed by Joseph Louisell and Neil Fink. Neil Fink argued several of the numerous motions in the Vito Giacalone gun and blackjack cases during times when Joseph Louisell was present in court. Neil Fink shared argument with Joseph Louisell of certain other motions in the gun and blackjack cases. Neil Fink handled aspects of the gun case when Mr. Louisell was not present.  *  *  *

"That the blackjack case was very much a team project, appears from transcript volume 10, page 99, when it was announced by Mr. Fink, concerning an upcoming hearing, that 'Somebody from our office will be there.' It is hard to believe that Vito Giacalone thought of his legal representation other than as a team effort."

No reversible error was here committed.

It is also contended that the information charging this defendant should have been quashed, because the preliminary examination was defective for the reason that the stenographers who recorded it were not county employees, nor were they appointed in accordance with the statute. MCLA 766.11 (Stat Ann 1954 Rev § 28.929). Defendant does not allege any errors in the transcript, nor that he was prejudiced in any manner. He merely contends that the statute must be strictly construed. We find that this error falls within the harmless error statute. CL 1948, 769.26 (Stat Ann 1954 Rev § 28.1096).

Defendant contends further that the lower court erred in denying defense counsel the opportunity to argue the applicable law during his closing arguments to the jury. The following dialogue will serve to illuminate this argument:

"(Mr. Barris, defense attorney): Now his Honor is going to give you certain rules which you must obey. Because you have a function, as he said, and

so does the court. And your function will begin after his Honor has completed his function, namely, to give you the law.

"And amongst the things which his Honor is going to indicate to you are these salient rules of law. And I realize that listening to them from his Honor once, it is difficult to comprehend, and I will try to, as best I can, so as to prepare you, state what they are. And if in any way I state the rules differently than his Honor, of course, you must take the law as the judge gives it.

"*Mr. Goussy (for the people)*: Your Honor, I am going to object to any lecture on the law from counsel. I think the people have totally refrained, and I think it is only proper that defense counsel refrains from presuming to instruct.

"*Mr. Barris:* On the contrary, I have never heard that objection made as long as I have been practicing.

"*The Court:* The law is going to be presented by the court, not by the lawyers. Sometimes it becomes necessary for the lawyers to make some references or allusions to the law in order to present their argument. That hasn't been demonstrated up to this point, and I am going to sustain the objection.

"*Mr. Barris:* Do I understand, your Honor, I cannot explain?

"*The Court:* That's correct. The jury will get the law from the court, not from the lawyers. I might tell the jury that the lawyers have had an opportunity to go over with the court the court's instructions on the law. The attorneys have a chance to advise the court and urge the court to give certain instructions. The court makes the decision on whether those instructions should be given.

"The law should be taken solely from the judge, and not from the lawyers.

"*Mr. Barris:* Well, I have made it clear to the jurors that the law must come from you. But if

I state the law correctly, I understood and have always understood that I could present it in my argument, and if there is any deviation between what I say and you, as I have already indicated, the court controls.

"*The Court:* No. If you are going to state the law correctly, there is going to be some needless repitition, which is going to do nothing more than expend time unnecessarily. If you state the law incorrectly, you are going to create the possibility of confusion and require additionally some unnecessary expenditure of time of the court correcting your statement.

"The jury should take the law from the court, and that's all the law the jury will need. You may continue."

Defendant now alleges that his intention was to instruct the jury on the law applicable to the facts. Nowhere during the above exchange did defense counsel indicate such intention. On the contrary, he stated that he was going to state the salient rules of law in order to prepare the jury for the judge's instructions. Apparently the defense attorney thought that the legal principles would be more easily comprehended, if the jury heard them explained twice.

The court ultimately ruled that defense counsel could not give a direct presentation of the law. The court said that it was proper to make references or allusions to the law in a closing argument. We conclude that the trial court did not unduly restrict defense counsel in his presentation to the jury.

Defendant next asserts that the lower court erred in refusing to deliver the charge to the jury as requested by the defendant. The proffered charge dealt with a defendant's right not to take the witness stand. The proposed instruction was as follows:

"Mr. Giacalone has seen fit not to take the stand as a witness in his own defense, which is his con-

stitutional right to observe. I instruct you that under your oath as jurors you may not and cannot comment in any way in the course of your deliberation upon his exercise of this constitutional right and I further instruct you that under your oath as jurors you may not and cannot in any way infer guilt by reason of his exercise of this constitutional right. The reason for this is that our law recognizes that an entirely innocent person, for a multitude of valid reasons, might see fit not to testify in his own behalf. By way of example, excessive timidity or nervousness, when facing others and attempting to explain transactions of suspicious character and offenses charged against him will often confuse and embarrass even an innocent person to such a degree as to increase rather than to remove prejudice against him. It is not everyone, however honest, who would therefore willingly be placed on the witness stand."

The trial judge's instruction was as follows:

"Under our law, a defendant may take the witness stand and testify in his own behalf or he may remain off the witness stand, as he sees fit. He has this right to remain off the witness stand or to take it, as he sees fit. If he does not take the witness stand, you are not to draw any inferences, unfavorable to him, from his failure to testify."

The above requested charge offered by defendant was predicated upon the rationale of *Griffin* v. *California* (1965), 380 US 609 (85 S Ct 1229; 14 L Ed 2d 106), in which the Court barred adverse comment on a defendant's right not to testify in his own behalf.

In *People* v. *Collins* (1942), 303 Mich 34, 53, it was appropriately stated:

"Where the trial judge uses his own phraseology but sufficiently instructs the jury as to the law, as

was done, no error is committed by failing to follow the wording of defendant's request to charge."

We find no reversible error in the court's instruction.

Defendant further alleges that the sentencing procedures used by the trial court, wherein the court referred to public records for information relative to the sentencing of the defendant, and did not allow the defendant to review the presentencing report, violated his rights of due process under the Fourteenth Amendment.

The trial judge may consult public records in determining sentencing. *People* v. *Losinger* (1951), 331 Mich 490 (44 ALR2d 1449). *People* v. *Camak* (1967), 5 Mich App 655, held that a defendant, under the present posture of the law, does not have the right to review a presentencing report, and commented upon the rationale of this holding:

"In a similar case, the United States Court of Appeals, first circuit, *Powers* v. *United States* (CA1, 1963), 325 F2d 666, 667, stated in part as follows:

" 'We do not think it was error, however, for the court to impose final sentence without giving Powers and his counsel an opportunity to review the report and recommendations of the director of the bureau of prisons and to present witnesses to show errors in the report. In *Williams* v. *New York* (1949), 337 US 241, 250, 251 (69 S Ct 1079; 93 L Ed 1337), the Court said that the Fourteenth Amendment was not to be treated "as a uniform command that courts throughout the Nation abandon their age-old practice of seeking information from out-of-court sources to guide their judgment toward a more enlightened and just sentence." And the Court also said: "We do not think the Federal Constitution restricts the view of the sentencing judge to the information received in open court. The due process clause should not be treated as a device for freezing the

evidential procedure of sentencing in the mold of trial procedure. So to treat the due process clause would hinder if not preclude all courts—state and Federal—from making progressive efforts to improve the administration of criminal justice." We see no basis for distinguishing between due process under the Fourteenth Amendment and due process under the Fifth Amendment. Indeed from the final sentence of the above quotation we think that the Court intended its statements to apply to due process under both Amendments. See *Hoover* v. *United States* (CA 10, 1959), 268 F2d 787, 790.'

"That the trial judge may consider additional factors in determining sentence is well settled in Michigan. *People* v. *Williams* (1923), 225 Mich 133; *People* v. *Losinger* (1951), 331 Mich 490 (44 ALR2d 1449); *People* v. *Guillett* (1955), 342 Mich 1." *People* v. *Camak, supra,* 662, 663.

No reversible error was committed herein.

As a final contention, defendant attacks the validity of the statute, MCLA § 750.224 (Stat Ann 1962 § 28.421), which makes possession of a blackjack illegal, alleging the same is unconstitutional. Although the constitutionality of this statute has not been decided by a Michigan court, the statute's predecessor,* however, was upheld in *People* v. *Brown* (1931), 253 Mich 537. The statute in *Brown* is essentially the same as the current statute; we find the reasoning therein applicable in the instant case and, therefore, conclude that the statute is not unconstitutional.

Conviction affirmed; the defendant's bond cancelled.

All concurred.

---

* PA 1929, No 206, § 3. "It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machinegun or firearm which can be fired more than 16 times without reloading * * * blackjack, * * * ."