PEOPLE v RYAN

Docket No. 100054. Argued October 11, 1995 (Calendar No. 6). Decided
    March 22, 1996.

Thomas J. Ryan was convicted by a jury in the Detroit Recorder's
    Court, James R. Chylinski, J., of possession with intent to deliver
    more than 650 grams of cocaine. The Court of Appeals, JANSEN, P.J.,
    and WAHLS and HOOD, JJ., affirmed in an unpublished opinion per
    curiam, but found that the defendant had established a prima facie
    case of actual governmental vindictiveness and remanded for an
    evidentiary hearing (Docket No. 113547). On remand, the court,
    Harvey F. Tennen, J., dismissed the case, finding that the federal
    agents who had arrested the defendant had indulged in forum
    shopping, thus denying the defendant his right to counsel and vio-
    lating his Fourteenth Amendment due process rights. The Court of
    Appeals, JANSEN, P.J., and WHITE and HANSEN, JJ., affirmed in an
    unpublished opinion per curiam (Docket No. 144052). The people
    appeal.

In an opinion by Justice WEAVER, joined by Chief Justice BRICKLEY,
    and Justices RILEY and BOYLE, the Supreme Court held:

The defendant failed to affirmatively prove actual vindictiveness
    because he did not show that the Wayne County prosecutor, by
    prosecuting under Michigan law, sought to penalize him for the
    exercise of his constitutional right to counsel. Nor did the defend-
    ant present any evidence of untoward collusion between the fed-
    eral investigation and the state prosecution, requiring reversal and
    reinstatement of defendant's conviction.

1. It is a violation of due process to punish a person for assert-
    ing a protected statutory or constitutional right. To do so is
    referred to as prosecutorial vindictiveness. There are two types of
    prosecutorial vindictiveness, presumed vindictiveness and actual
    vindictiveness. Actual vindictiveness will be found only where
    objective evidence of an expressed hostility or threat suggests that
    the defendant was deliberately penalized for the exercise of a pro-
    cedural, statutory, or constitutional right. The burden is on the
    defendant to affirmatively establish actual vindictiveness. The mere
    threat of additional charges during plea negotiations does not

amount to actual vindictiveness where bringing the additional charges is within the prosecutor's discretion.

2. The mere threat to refer this case for state prosecution does not amount to objective evidence of hostile motive because it came from a person who lacked authority to prohibit the Wayne County prosecutor from exercising the legitimate power to prosecute violations of Michigan law. The state has independent authority to prosecute crimes within its borders. Thus, the Wayne County prosecutor had independent authority to pursue charges against the defendant regardless·of any deal suggested by the federal agent. Further, no evidence of impermissible collusion was presented.

3. Although fundamental fairness requires that promises made during plea bargaining be respected, the agent who makes a promise must be authorized to do so, and the defendant must detrimentally rely on the promise. In this case, there was no showing that the federal agent was authorized by federal or state prosecutors to make promises to the defendant that would preclude state prosecution. The defendant's difficulty in obtaining counsel did not amount to detrimental reliance. Because the defendant failed to affirmatively prove with objective evidence that the referral for state prosecution was motivated by hostility or that there was an unjustifiable connection between the federal agent's threats and the state prosecution, there was no actual vindictiveness.

Reversed.

Justice Levin, joined by Justices Cavanagh and Mallett, dissenting, stated that the Drug Enforcement Administration, not the Wayne County Prosecutor, violated the defendant's rights under the Fifth Amendment respecting self-incrimination and the assistance of counsel when evidence it compiled was turned over to state authorities in order to punish the defendant with the harsher penalty imposed by Michigan law for exercising his right to consult counsel before deciding whether to waive his privilege against self-incrimination. Thus, the defendant's conviction should be reversed and the case remanded for a new trial at which none of the evidence should be used. Only such evidence as the prosecutor can show was obtained before or without regard to whether the DEA had turned over the evidence it compiled to the state should be used.

The United States government may not punish an accused for exercising the privilege against self-incrimination and the right to counsel. The judge's findings that the DEA turned the evidence that it had compiled against the defendant over to state law enforcement officers to punish him for exercising his right to counsel are amply supported and were not clearly erroneous. Thus, his deci-

sion should be affirmed. A DEA agent may offer concessions in the prosecution of federal offenses in exchange for cooperation leading to the arrest of other offenders, but it must be done within constitutional limitations and may not punish an offender for the exercise of rights under the Fifth Amendment respecting self-incrimination and the assistance of counsel.

The state may prosecute for violation of its laws at least where, as here, the federal government has not prosecuted for violation of federal law. This was not a case in which federal and state law enforcement officers were jointly investigating and together apprehended a drug trafficker. State law enforcement officers were not meaningfully involved in the defendant's apprehension. But for the conduct of the DEA in turning over to the state the evidence it had compiled as punishment for the defendant's exercise of his rights, the state is not likely to have become aware of the evidence against the defendant and probably would have little, if any, evidence with which to prosecute.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *John D. O'Hair*, Prosecuting Attorney, *Timothy A. Baughman*, Chief, Research, Training and Appeals, and *Jeffrey Caminsky*, Assistant Prosecuting Attorney, for the people.

*Richard M. Lustig* for the defendant.

Amicus Curiae:

*Richard B. Ginsberg* for Criminal Defense Attorneys of Michigan.

WEAVER, J. At issue in this appeal is whether the federal Drug Enforcement Agency's referral of defendant to state prosecution rendered the state prosecution vindictive. This Court has addressed the issue of vindictive prosecution where a sentence is increased after a defendant's appeal from a criminal conviction,[1] but has

---

[1] *People v Payne*, 386 Mich 84; 191 NW2d 375 (1971); *People v Jones*, 403 Mich 527; 271 NW2d 515 (1978); *People v Mazzie*, 429 Mich 29; 413 NW2d 1 (1987).

not directly addressed alleged actual vindictiveness aris-
ing in the dual-sovereign pretrial context.[2]

We find that the defendant in this case failed to
affirmatively prove actual vindictiveness because he did
not show that the Wayne County prosecutor, by pros-
ecuting under Michigan law, sought to penalize defend-
ant for exercising his constitutional right to counsel.
Nor did defendant present any evidence of untoward
collusion between the federal investigation and the state
prosecution. The Court of Appeals is reversed and the
defendant's conviction reinstated.

I

Defendant, Thomas J. Ryan, was arrested with a kilo-
gram of cocaine in Livonia, Michigan on the evening of
March 21, 1987, as part of a federal drug investigation.
Local Livonia police support was solicited to facilitate
defendant's arrest. Federal agent Hubert Coleman ques-
tioned defendant at the scene and told him that if he
cooperated with the federal investigation, Agent Cole-
man would pursue federal rather than state charges.
This "deal" was favorable to defendant because a con-
viction in the State of Michigan for possession with
intent to deliver 650 grams of cocaine carries a
mandatory life sentence, while federal prosecution for
the same act carries only a possible sentence of twenty-
four to thirty-six months in jail.

Defendant was taken to the Livonia police station
where federal agents played audiotapes involving
defendant's conversations with a Cleveland contact.
Later that night, Agent Coleman traveled to Cleveland in
an unsuccessful attempt to locate an additional two kilo-

---

[2] This Court denied leave in two cases involving preconviction
prosecutorial conduct: *People v Watts*, 149 Mich App 502; 386 NW2d 565
(1986), and *People v Goeddeke*, 174 Mich App 534; 436 NW2d 407 (1988).

grams of cocaine thought to be connected to defendant's operation.

At some point during questioning, defendant requested counsel.[3] Because defendant's attorney, Kenneth Cockrel, was unavailable, attorney James Feinberg responded to defendant's call. However, attorney Feinberg made it clear, at least to defendant, that he would not represent defendant if he cooperated with the federal investigation.[4] Attorney Cockrel arrived the next day to represent defendant, but found that the "deal" was off the table.[5]

Defendant's case was referred to the Wayne County prosecutor, and he was arraigned on March 23, 1987, two days after his arrest. Defendant was convicted in state court of possession with intent to deliver more than 650 grams of cocaine and sentenced to life in prison.

The Court of Appeals affirmed his conviction, but found that the defendant had established a prima facie

---

[3] There was no claim raised or argued regarding any violation of defendant's Fifth Amendment right to counsel; therefore, the dissent's suggestion that evidence should have been suppressed, see *post*, p 60, n 30, is misleading and unsupportable.

[4] Though attorney Feinberg's personal convictions may have made representation of a cooperating defendant uncomfortable, his refusal to represent the defendant under these circumstances and his failure to clearly communicate his intention not to represent this defendant to the federal agents unnecessarily aggravated defendant's circumstances.

[5] The trial court stated:

Defendant testified also, that he asked Mr. Feinberg to contact Mr. Cockrel, and that Mr. Feinberg must have done so, since Mr. Cockrel did come to see him. When Mr. Cockrel came, defendant informed that he wanted to "cooperate." Mr. Cockrel replied, "Tom, its too late, they've pulled the deal off the table, they don't want to hear any discussions whatsoever." Defendant said that this conversation took place before he was arraigned. (No objection was made to this hearsay testimony.) [Detroit Recorder's Court, Docket No. 87-03365, p 8.]

case of actual governmental vindictiveness and, there-
fore, remanded for an evidentiary hearing. Unpublished
opinion per curiam, issued May 9, 1991 (Docket No.
113547). The Court of Appeals did not retain
jurisdiction.

On remand, the trial court heard testimony from fed-
eral agents, attorney James Feinberg, and the defendant.
The trial court found that Agent Coleman went to Cleve-
land only because of information provided by defendant
after defendant requested counsel but before defendant
spoke to counsel, that Agent Coleman knew that defend-
ant did not yet have an attorney when Agent Coleman
went to Cleveland, and that defendant did not have the
opportunity to consult with an attorney before the deal
was removed from the table.

On the basis of these findings the trial court con-
cluded: "DEA Agents, particularly, supervising agent
Hubert Colman [sic], indulged in a forbidden form of
forum shopping in this instance . . . that as a result of
that alone, defendant was prosecuted in the criminal
justice system of the State of Michigan." Detroit
Recorder's Court, Docket No. 87-03365, pp 12-13. This,
the trial court concluded, "not only denied defendant his
right to counsel but violated his rights under the Due
Process Clause of the Fourteenth Amendment to the
Federal Constitution as well." *Id.*, p 14.

The Court of Appeals affirmed the trial court's dismis-
sal in an unpublished opinion per curiam, entered Feb-
ruary 24, 1994 (Docket No. 144052). We granted leave
by order entered January 5, 1995. 448 Mich 852.

II

It is a violation of due process to punish a person for
asserting a protected statutory or constitutional right.
*North Carolina v Pearce*, 395 US 711; 89 S Ct 2072; 23 L
Ed 2d 656 (1969); *People v Goeddeke*, 174 Mich App 534,

536; 436 NW2d 407 (1988). "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort . . . ." *Bordenkircher v Hayes*, 434 US 357, 363; 98 S Ct 663; 54 L Ed 2d 604 (1978).

Such punishment is referred to as prosecutorial vindictiveness. There are two types of prosecutorial vindictiveness, presumed vindictiveness and actual vindictiveness. Actual vindictiveness will be found only where objective evidence of an "expressed hostility or threat"[6] suggests that the defendant was deliberately penalized for his exercise of a procedural, statutory, or constitutional right. See, e.g., *United States v Goodwin*, 457 US 368, 374, 380, n 12; 102 S Ct 2485; 73 L Ed 2d 74 (1982).[7] The burden is on the defendant to affirmatively establish actual vindictiveness. *People v Watts*, 149 Mich App 502, 511; 386 NW2d 565 (1986). The mere threat of additional charges during plea negotiations does not amount to actual vindictiveness where bringing the additional charges is within the prosecutor's charging discretion.[8]

The Court of Appeals found that defendant established a prima facie case of actual vindictiveness and

---

[6] *United States v Gallegos-Curiel*, 681 F2d 1164, 1168 (CA 9, 1982).

[7] In this case, the Court of Appeals did not address whether a presumption of vindictiveness arose; therefore, we need only address whether actual vindictiveness is apparent in the federal agent's referral of defendant for state prosecution.

[8] *Bordenkircher, supra* at 364-365. *Bordenkircher* stated further:

To hold that the prosecutor's desire to induce a guilty plea is an "unjustifiable standard," which, like race or religion, may play no part in his charging decision, would contradict the very premises that underlie the concept of plea bargaining itself. Moreover, a rigid constitutional rule that would prohibit a prosecutor from acting forthrightly in his dealings with the defense could only invite unhealthy subterfuge that would drive the practice of plea bargaining back into the shadows from which it has so recently emerged.

was entitled to an evidentiary hearing.[9] The Court relied on

> assertions by defendant that the drug enforcement adminis-
> tration threatened to bring charges in Michigan and ulti-
> mately did so after defendant requested assistance of coun-
> sel in deciding whether to cooperate with the
> administration . . . .[10]

We agree that the evidence is undisputed that federal agent Coleman told defendant during initial questioning that if defendant refused to cooperate, the case would be referred for state prosecution. It is also undisputed that defendant requested counsel. Sometime thereafter, before defendant met with Attorney Cockrel, the "deal" was withdrawn and the case was referred by the federal agent to state prosecutors. However, this sequence of events does not dictate a conclusion that the defendant was vindictively deprived of his constitutional right to counsel.

We find that the mere threat to refer the case for state prosecution does not amount to objective evidence of hostile motive because it came from an individual who lacked authority to prohibit the Wayne County prosecutor from exercising his legitimate power to prosecute violations of Michigan law.

Implicit in the trial court's reasoning is that the state would have been unable to prosecute defendant

---

[9] The Court of Appeals erroneously cited *People v Watts, supra* at 511, for the proposition that a presumption of vindictiveness would never arise in the pretrial context and, therefore, it was necessary for the defendant to affirmatively prove actual vindictiveness. *People v Watts* simply declined to apply the presumption to the facts of that case.

[10] Unpublished opinion per curiam, entered May 9, 1991 (Docket No. 113547), slip op at 2.

if the federal government had also pursued charges. But the state has independent authority to prosecute crimes within its borders. In *In re Illova*, 351 Mich 204, 209; 88 NW2d 589 (1958) (rev'd on other grounds), this Court stated:

> When a defendant has violated both State and Federal laws he is liable to each sovereign and subject to prosecution by each. It is not his privilege to choose which shall first inflict punishment. If any comity between sovereigns is violated, the offended sovereign may complain, not the defendant.

Thus, the Wayne County prosecutor had independent authority to pursue charges against this defendant regardless of any "deal" suggested by the federal agent. It is also well accepted that the vindictiveness of one sovereign is not normally chargeable to the independent decision to prosecute by a separate sovereign because the likelihood of prosecutorial abuse is minimized. *United States v Schoolcraft*, 879 F2d 64, 68 (CA 3, 1989), citing *United States v Ballester*, 763 F2d 368, 370 (CA 9, 1985).

For example, in *United States v Schoolcraft, supra,* the defendant argued that a state prosecutor had acted vindictively when he referred a federal firearms offense to the United States attorney. The defendant made two allegations: first, the defendant claimed that the state prosecutor made the referral because the federal penalties were stiffer than the state's penalties; and, second, he alleged that the state prosecutor, as private counsel, had represented parties that settled a civil suit favorable to defendant. At the conclusion of the civil suit, the prosecutor allegedly

stated that he would "nail [defendant] to the wall" if he ever came before him. *Id.* at 67.

On these facts, the United States Court of Appeals for the Third Circuit found no vindictive prosecution. The court stated that it would not focus on the actions of the state prosecutor, but rather on the United States attorney who prosecuted defendant's case.

The Court of Appeals employed a similar analysis in *United States v Fulford*, 825 F2d 3 (CA 3, 1987). In *Fulford*, the defendant asserted that the state prosecutor "badgered" and "pressured" a federal agent into seeking an indictment against the defendant for counterfeiting. The defendant claimed that the state prosecutor wanted the federal indictment so that he could use it as leverage in his attempt to get the defendant to cooperate in the prosecution of another individual on state charges.

Again, the court found that the defendant had failed to make out a claim of vindictiveness because he had failed to show improper conduct on the part of the sovereign that ultimately prosecuted the matter. In reaching its decision, the court stressed that the federal government's authority to prosecute violations of federal law is independent of the prosecutorial rights of other sovereigns.

The same can be said of the State of Michigan's authority to prosecute the present case. The authority exists independently from that of other sovereigns. Except in the rarest of circumstances, that authority cannot be undermined by the unlawful actions of other sovereigns.

Furthermore, to find that a federal agent's actions could so taint a state decision to prosecute, there

would have to be evidence of some untoward collusion between the federal referral and the state prosecution where the state acted as a "stalking horse" for the federal investigation. *Schoolcraft, supra* at 68. In the case before us, there simply was no evidence presented of such impermissible collusion. In fact, while the DEA made the referral in this case, local police were at the scene of defendant's arrest and were certainly aware that he had violated Michigan law by possessing a kilogram of drugs. This information was obtained independently from Agent Coleman's referral of the facts to the prosecutor. Thus, it is altogether possible that, even without Agent Coleman's referral, Livonia Police would have eventually involved the state prosecutor in this case. In any event, we hesitate to forestall such action with a ruling that would prohibit state authorities from prosecuting where they clearly had a right to do so.

Finally, the trial court clearly erred when it relied on the activities of the federal agent, given the fact that the agent had no authority to preclude state prosecution.[11] Implicit in the trial court's analysis is the misconception that if the defendant did give information to the agents at the station that motivated the Cleveland trip, his cooperation created a quid pro quo requiring the agents to keep the deal available.[12]

---

[11] The trial court concluded: "It is also clear that the agent did obtain some information from the defendant" because if the Cleveland information had been on the tapes, the agent would not have needed to question the defendant further at the Livonia station. Detroit Recorder's Court, Docket No. 87-03365, p 10.

[12] The trial court concluded:

This court also [sic] as a fact that the Government denied the defendant defendant's right to obtain counsel in order to negotiate for the bargain it invited. A fair review of Agent Colman's [sic]

As a general rule, " 'fundamental fairness requires that promises made during plea-bargaining and analogous contexts be respected' . . . ." *United States v Streebing*, 987 F2d 368, 372 (CA 6, 1993) (quoting *Johnson v Lumpkin*, 769 F2d 630, 633 [CA 9, 1985]). However, this rule has two conditions: "(1) the agent must be authorized to make the promise; and (2) the defendant must rely to his detriment on the promise." *Streebing, supra* at 372. There is no evidence that Agent Coleman was authorized by federal or state prosecutors to make promises to defendant that would preclude state prosecution.[13] As we have noted, the state had the sovereign authority to pursue charges against this defendant. Furthermore, we do not see that the defendant's difficulty in obtaining counsel amounts to detrimental reliance.[14]

Because defendant failed to affirmatively prove with objective evidence that the state prosecution was motivated by hostility or that there was an unjustifiable connection between the federal agent's threats and the state prosecution, we find no actual vindictiveness.

---

testi[m]ony as well as his actions, and a fair review of the testimony of the other witnesses leads to that conclusion. [Detroit Recorder's Court, Docket No. 87-03365, p 12.]

[13] This court addressed enforcement of unauthorized promises made by police in *People v Gallego*, 430 Mich 443; 424 NW2d 470 (1988). In *Gallego*, this Court declined to make binding unauthorized promises made by police. To assume that the unauthorized "deal" in this case was binding would preclude an otherwise valid conviction.

[14] The argument for detrimental reliance is especially weak in this case, since the defendant never agreed to "deal" with the police. In other words, there is no preagreement position to which this Court could return defendant. Compare *People v Gallego*, n 13 *supra*, 455-457.

III

There is no doubt that defendant had a constitutional right to counsel. Nevertheless, the issue we dealt with involves whether the defendant was vindictively prosecuted in derogation of that right. We find that he was not. Vindictive prosecution in the dual-sovereign context does not occur where the prosecuting sovereign does nothing improper. A contrary result is inconsistent with a system of government that recognizes the state's independent authority to punish those who commit crimes within its borders. Accordingly, we reverse the Court of Appeals and reinstate the defendant's conviction.

BRICKLEY, C.J., and RILEY and BOYLE, JJ., concurred with WEAVER, J.

LEVIN, J. (*dissenting*). Thomas J. Ryan was convicted of possession with intent to deliver more than 650 grams of cocaine, and sentenced to the mandatory term of life imprisonment without possibility of parole.[1] The Court of Appeals affirmed in an unpublished per curiam opinion,[2] but found that Ryan had established a prima facie case of governmental vindictiveness and remanded for an evidentiary hearing.[3]

---

[1] MCL 333.7401(2)(a)(i); MSA 14.15(7401)(2)(a)(i).

[2] Issued May 9, 1991 (Docket No. 113547).

[3] The Court said:

[D]efendant alleges that he was denied due process when the drug enforcement administration penalized defendant after defendant exercised his right to counsel after the drug enforcement administration requested cooperation. In a motion for a new trial, defendant alleges that agents at the Livonia police headquarters told defendant that if he were willing to cooperate as to his "source" that they would charge defendant in Federal Court where his maximum sentence would be thirty-six months in prison as opposed to the Michigan mandatory term of life without parole. Defendant stated that he told the agents that before he would enter into a deal, he wanted to speak to an attorney. Defendant further alleges that the agents threatened defendant with prosecution in a

On remand, the Recorder's Court judge set aside the conviction and ordered Ryan discharged on a finding that the Drug Enforcement Administration agents who arrested Ryan had denied him his right to counsel.[4] After

state court unless he made a decision at that time. Subsequently, defendant was tried in state court.

A government actor's actions are vindictive and violative of due process if it punishes a person for exercising a protected statutory or constitutional right. *United States v Goodwin,* 457 US 368, 372; 102 S Ct 2485; 73 L Ed 2d 74 (1982), *Bordenkircher v Hayes,* 434 US 357; 98 S Ct 663; 54 L Ed 2d 604 (1978), *People v Goeddeke,* 174 Mich App 534, 536; 436 NW2d 407 (1988). Vindictiveness is not presumed in pretrial actions concerning a prosecution's charging function. *People v Watts,* 149 Mich App 502, 511; 386 NW2d 565 (1986). Thus, in order to establish his claim of a denial of due process, defendant must affirmatively prove actual vindictiveness. *Id.* However, a defendant is entitled to an evidentiary hearing on a charge of vindictiveness when defendant makes a *prima facie* case based on facts sufficient to raise a reasonable doubt about the government agency's purpose. *People v Napue,* 834 F2d 1311, 1329 (CA 7, 1987). The extent to which the government had obtained its evidence prior to defendant's assertion of some right is one of the key indicia scrutinized by courts when confronted by a claim of vindictive prosecution. *Id.* at 1330.

In the present case, we hold that the assertions by defendant that the drug enforcement administration threatened to bring charges in Michigan and ultimately did so after defendant requested assistance of counsel in deciding whether to cooperate with the administration, creates a *prima facie* case of vindictiveness entitling defendant to an evidentiary hearing. Because the lower court record does not supply a complete evidentiary basis to decide the issue of vindictiveness, we remand to the trial court for an evidentiary hearing on this issue.

[4] The judge said:

This court also [finds] as a fact that the Government denied the defendant defendant's right to obtain counsel in order to negotiate for the bargain it invited. A fair review of Agent Colman's [sic] testi[m]ony as well as his actions, and a fair review of the testimony of the other witnesses leads to that conclusion. The court is also satisfied that the DEA Agents, particularly, supervising agent Hubert Colman, indulged in a forbidden form of forum shopping in this instance. It finds that as a result of that alone, defendant was prosecuted in the criminal justice system of the State of Michigan.

\*   \*   \*

While the United States Supreme Court has held that the Due Process Clause of the Fourteenth Amendment is not violated by the mere fact that the prosecutor "carries out a threat made during plea negotiations," it has firmly held that to punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort. *United States v Goodwin,* 457 US 368, 384; 102 S Ct 2485; 73 L Ed 2d 74 (1982), and *Blackledge v Perry,* 417 US 21; 94 S Ct 2098; 40 L Ed 2d 628 (1974). It is in the context of this principle that this court finds a violation of due process in the State prosecution of this defendant. The defendant clearly had a right to have the assistance of counsel. *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

The court finds as a matter of fact and as a matter of law that the defendant was denied his right to counsel. It is clear from the testimony, not merely that of the defendant but attorney Feinberg and Supervising DEA Agent Hubert Colman as well, that Colman knew that defendant had not been counselled in regard to the advisability of cooperating with the Federal authorities and making statements in line with such cooperation. Yet, without providing the defendant any additional and reasonable opportunity to consult with counsel, the Federal authorities referred the case to State jurisdiction and the harsher penalty. Furthermore, this was done after information was obtained from the defendant, without counsel. The defendant testified in effect, that while he did not tell them everything he knew he did give them information about people in Cleveland, and named one individual.

The court finds further, as a matter of fact and as a matter of law, that surrendering the defendant to State prosecution under the circumstances was vindictive governmental action which not only denied defendant his right to counsel but violated his rights under the Due Process Clause of the Fourteenth Amendment to the Federal Constitution as well.

The court does not wish to be misunderstood as saying that the mere fact that state prosecution under a harsher statute simply because the defendant would not cooperate would necessarily amount to vindictiveness. The agents did not merely choose to go to the State court. Had they done that merely to see that defendant, if convicted, would have received a harsher sentence even to punish the defendant, that would not have been a denial of due process. See *Bordenkircher v Hayes,* 434 US 357; 98 S Ct 663; 54 L Ed 2d 604 (19[78]), and *People v Goeddeke,* 174 Mich App 534, 536-537 (1988). While these cases strongly support that view, they unanimously hold that "to punish a person for exercising a statutory or constitutional right violates due process." (*Goeddeke,* p 536.) See also, *United States v Goodwin, supra.*

\*          \*          \*

remand, the Court of Appeals affirmed in an unpub-
lished per curiam opinion.[5]

The majority reverses and reinstates Ryan's convic-
tion. The majority states that Ryan failed to prove actual
vindictiveness because he did not show that the pros-
ecutor, by commencing this prosecution under the Mich-

---

It is not material that neither the State authorities, county pros-
ecutor nor local law enforcement officers participated in what took
place. The state prosecution was a product of the denial of due
process and it is the court's responsibility to protect against due
process violations, and to provide an appropriate remedy when
that occurs.

... Having found, as aforesaid, that the prosecution was the
result of governmental vindictiveness which amounted to a denial
of due process, the court will order the conviction set aside and
the defendant discharged.

[5] Issued February 24, 1994 (Docket No. 144052). The Court said:

As with any finding of fact by the trial court, we review a finding
of governmental vindictiveness for clear error. MCR 2.613(C);   see
also *United States v Schoolcraft*, 879 F2d 64, 67 (CA 3, 1989);
*United States v Meyer*, 258 US App DC 263, 265; 810 F2d 1242
(1987). In so doing, we give regard to the special opportunity of
the trial court to judge the credibility of the witnesses who appear
before it. MCR 2.613(C).

Our review of the evidence persuades us that the facts found by
the trial court are not clearly erroneous. While the evidence lends
itself to different interpretations, we are not prepared to say that
the trial court clearly erred in finding governmental vindictiveness.
The trial court carefully considered all the evidence and set forth
sound reasons for crediting defendant's account of the conversa-
tions and events. Moreover, the evidence established that this was
a federal investigation and that there was no state involvement
until the Livonia Police Department was called in to provide back
up for the arrest. A DEA agent testified that she could recall no
case involving over 650 grams, in her six years as an agent, that
had been turned over for state prosecution. The court's findings
that after defendant requested an opportunity to consult with coun-
sel and his initial attempt to obtain the advice of counsel failed, the
federal authorities referred the case to the state without providing
defendant "any additional and reasonable opportunity to consult
with counsel," and that they did so out of vindictiveness, were not
clearly erroneous.

igan drug laws, sought to penalize Ryan for the exercise of his constitutional right to counsel.[6]

I agree with the majority that the prosecutor did not act vindictively in commencing this prosecution. The prosecutor committed no wrong.

It was the United States government, not the Wayne County prosecutor, who violated Ryan's rights. A DEA supervising agent asked Ryan to provide information and other aid to the DEA in addition to information Ryan had already provided during DEA interrogation shortly after his arrest.[7] Soon after the DEA agent concluded that Ryan would not be providing additional information and aid to the DEA, the DEA turned over to state authorities evidence it had obtained during surveillance and as a result of Ryan's arrest.

The penalty for Ryan's conduct under Michigan law is a mandatory term of life imprisonment without possibility of parole.[8] The penalty under federal law is no more than fifteen years, and the guideline sentence was twenty-four to thirty-six months.[9] Ryan's rights under the Fifth Amendment respecting self-incrimination and to the assistance of counsel[10] were violated when, as the

---

[6] The majority adds that Ryan did not present any evidence of untoward collusion between the federal investigation and the state prosecution.

[7] Information was provided by Ryan shortly after his arrest after he asked to consult counsel, and the DEA agent nevertheless continued to interrogate him.

[8] See n 1 and accompanying text.

[9] See n 19.

[10] The majority states that "no claim [was] raised or argued regarding any violation of defendant's Fifth Amendment right to counsel . . . ." *Ante*, p 34, n 3.

The Recorder's Court judge found "as a fact that the Government denied the defendant defendant's right to obtain counsel," and that "the defendant was denied his right to counsel," and more specifically

     It is in the context of this principle that this court finds a violation of due process in the State prosecution of this defendant. The

Recorder's Court judge found, the evidence so compiled by the DEA was turned over to state authorities to punish Ryan with the harsher penalty imposed by Michigan law for exercising his right to consult counsel before deciding whether to waive his privilege against self-incrimination by providing additional information to the DEA agent.

We would modify the order entered by the Recorder's Court judge and the decision of the Court of Appeals to provide that Ryan's conviction is reversed and the case is remanded for a new trial at which none of the evidence compiled by the DEA turned over to state law enforcement officers as punishment for Ryan's exercise of his rights may be used during retrial. We would hold that only such evidence as the prosecutor can show was obtained before or without regard to whether the DEA had turned over the evidence it compiled to the state may be used during retrial.

I

Ryan had been under surveillance by the DEA. Shortly after the delivery of a kilogram of cocaine to an undercover officer in the nighttime on March 21, 1987, Ryan was arrested in a motel in Livonia. Ryan testified, as set forth in the judge's findings of fact, that within a few minutes there were about five agents in the room, and that Hubert Coleman, the DEA agent in charge, ordered the other agents out of the room and said, "I want to talk to this man alone."

---

defendant clearly had a right to have the assistance of counsel. *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

In citing *Miranda,* the Recorder's Court judge invoked the Fifth Amendment because "[t]he right to counsel discussed in *Miranda* has come to be known as the Fifth Amendment, or *Miranda,* right to counsel." Dressler, Understanding Criminal Procedure, § 139, p 286.

A

Apparently, as a result of monitoring telephone con-
versations, Coleman was under the impression that
Ryan's source had another two kilograms of cocaine.

Ryan testified that Coleman said that Ryan would
receive "a two year sentence in the Federal prison sys-
tem" if he would cooperate in locating the other two
kilograms. If he did not cooperate, he would be pros-
ecuted in the Michigan judicial system where, upon con-
viction, he would, because the quantity exceeded 650
grams, be sentenced to the mandatory term of life
imprisonment without possibility of parole.

Ryan further testified that when he asked to consult
with a lawyer, Coleman said, "okay, we're going to take
you down to the station."[11] Ryan was then transferred to
the Livonia police station where he was placed in an
interrogation room with a "roomful" of agents and they
again presented him with the "deal."

Coleman acknowledged that he may have played
tapes of monitored telephone conversations to Ryan "to
let him know that we have them."

Ryan testified that he said, "look, I want to cooperate
but I want to make sure what you're telling me is actu-
ally true.[12] They said okay, you're going to have a
chance to talk to an attorney but you've got to answer
some more questions first." He said that he answered
the questions "that I felt that I could." Asked if they con-

---

[11] The record does not indicate when *Miranda* warnings were given to
Ryan. Coleman testified that he had provided Ryan with *Miranda* warn-
ings, but did not have him sign an "acknowledgement of his constitutional
rights"; "I just advised him verbally, but I did have witnesses to that."

[12] Ryan explained that he wished to consult a lawyer to verify that the
DEA would follow through on the offer. He was concerned that if it did
not, it would have been just his word against the agents and he "knew
who the authorities would believe."

cerned "the nature and extent of the people in Cleveland," Ryan replied that "they did."

Coleman acknowledged that Ryan did not refuse the deal, but rather, "he just didn't know. He needed an attorney."

B

When Ryan was permitted to make a phone call, he reached an answering service and learned that the lawyer he wished to speak with was unavailable. He was referred to another lawyer who appeared within an hour and spoke to Coleman, and then to Ryan and declined to represent Ryan because this lawyer did not represent persons who "cooperate" with law enforcement.

Coleman testified that he told the lawyer that he planned "to take the case to State prosecution," which would result in a mandatory life sentence because the quantity exceeded 650 grams. Coleman advised the lawyer that if "Ryan could cooperate with us and tell us where [the other two kilograms were] and work with us in the next few hours or days like over that weekend to get that package that perhaps we could defer this case to Federal Court . . . ." He added that he advised the lawyer that "if there was a possibility of cooperation that night or that weekend that we could maybe defer this thing in Federal Court." If Ryan had cooperated, the DEA "would have started making a taped telephone call, we would have tried to figure out how we could get an undercover guy into this guy . . . ." "[W]e would have started working it that night." Coleman said that if Ryan had cooperated, he would have prosecuted in federal court.

C

The judge found that when the lawyer who declined to represent Ryan left the Livonia police station, Cole-

man concluded that Ryan would not cooperate.[13] Coleman then drove from Livonia to Cleveland in the early morning hours, seeking to find persons who perhaps had received a telephone call at a motel in Cleveland. He found a person occupying the room in the motel, but the two kilograms of cocaine were not there. Coleman surmised that the person who had been waiting to receive money for the kilogram Ryan had delivered to an undercover officer probably was no longer there.

The judge found that "Coleman left for Cleveland because of some information he received from the defendant. The question tends to pose itself: If they had everything on the tapes why have any interest in the defendant's information."[14]

---

[13] The judge found:

The court notes also, that shortly after speaking with the attorney, Mr. Feinberg, and learning that Mr. Feinberg would not represent the defendant in negotiating a deal for cooperation, Mr. Coleman, obviously took that as a rejection by defendant, when it really meant that defendant did not yet have a lawyer. Mr. Coleman left immediately for Cleveland intending to make a "bust." Some of the information which he had, he obviously got from the defendant, who testified that while he was told that he could have a lawyer, he would have to answer some questions first. He said that he did. If whatever knowledge or information regarding Cleveland suspects Mr. Coleman sought from the defendant was already on the tapes or otherwise within his knowledge, he and other agents, no doubt, would have taken steps to seize the Cleveland suspects simultaneously with the Livonia operation. Had that information been at hand, would would [sic] have been no reason to "deal" with this defendant.

It is clear that the defendant never had a chance to hire or consult wth [sic] a lawyer until after the deal had been "taken off the table."

[14] Earlier in his decision, the judge said:

In response to further questions, defendant said that when he discussed the matter at the Livonia Police Department he gave some of the information about Cleveland people. He said that he named one person, Willie Butka. He stated further, that "he, (apparently referring to Colman [sic]) played tapes for me that says, 'look,

Coleman also testified that by the time the lawyer Ryan had first sought to reach by telephone arrived the morning after the arrest, the deal was, as the lawyer reported to Ryan, off the table because, as Coleman testified, the DEA was then "committed to go to State Court."

D

It appears from the testimony of the other DEA agent who testified that Coleman had directed her to begin processing Ryan for transfer to state prosecutorial authorities before he left for Cleveland.

This DEA agent also testified that no state law enforcement officer was involved in the investigation or interrogation of Ryan.[15] The judge so found.[16]

---

here's the phone calls from Cleveland, we know you're there, we know this guy is here so why dont't [sic] you just go with us tonight and we'll get him and you'll do your two years and that will be it,' and I told them that was alright."

He said he was told, ". . . this is your chance right now. You go to Cleveland right now or the deal's off. If you want to stand up and be the only man the [sic] you're going to do life."

When asked by the prosecutor if the agent indicated how he was going to take the defendant back to Cleveland, he said that he was told, "we'll drive you to Cleveland. We won't even handcuff you."

Coleman's version of what occurred was somewhat different, but he did not directly contradict Ryan's testimony about going to Cleveland.

[15] She also testified that the taped cassettes of telephone conversations during the surveillance and the nonnarcotic evidence were kept under the control of the DEA, and the seized drugs were sent to the Chicago office of the DEA for evaluation.

The Livonia Police Department was informed by the DEA of the impending drug transaction, and may have provided surveillance and backup, but did not actually participate in the investigation or arrest or in the interrogation.

[16] This had not, in fact, been a joint operation between Federal and State or County agents. Defendant had been investigated exclusively by Federal agents, Federal funds had gone into the undercover work and he had been arrested by Federal agents, with the Livonia police only providing stand-by assistance.

E

Coleman testified that he thought that because three kilograms of cocaine were involved, a life sentence was appropriate. Nevertheless, he was "definitely interested in the other two kilos to see if we could get the cooperation from the defendant."

Coleman testified that he had authority as a group supervisor "to opt to go Federal or State." Coleman acknowledged that there had been "some" multiple kilogram cases in which he was involved that had been tried in federal court, and thus those cases had not been prosecuted in state court.[17] The other DEA agent who testified said that in the six years that she had been a DEA agent, she was not aware of any case, other than this case, in which federal law enforcement authorities declined to prosecute where as much as 650 grams were involved.[18]

---

[17] Q. Sir, as supervisor of Group II of the Drug Enforcement Administration, is it a fair statement, sir, that you have had many cases over 10 kilos that you've always brought to Federal Court?

A. No, I haven't had that many, 10 kilos, but I've had many cases go to Federal Court.

Q. And they were multiple kilo cases, were they not, sir?

A. There have been some.

Q. More than a dozen?

A. Oh, I don't know how many there's been.

Q. How long have you been a supervisor in the Drug Enforcement Administration in Detroit, sir?

A. Just two and a-half years.

[18] Q. [By the prosecutor]: In your experience as a DEA agent, have there been any other cases where you have referred matters over to the State for prosecution?

A. There has been a few cases that investigation did not materialize and we only found maybe an ounce or so and was declined by the Federal United States Attorney's office. Those cases we have referred to the State. There has not been a case that I referred to the State based on Federal over 650.

Q. That's since this time?

A. That's correct. I have not referred any cases to State over 650.

F

The judge found that "Colman's [sic] testimony that a deal *never* would have been offered in a case involving that amount of cocaine, does not reconcile with all of his own testimony, nor with other testimony. Although it would have been highly beneficial to defendant to have faced Federal prosecution rather that [sic] State prosecution, according to the testimony of [the other DEA agent], it would not have been unusual." (Emphasis in original.)

The judge said that among the factors that persuaded him to discredit Coleman's testimony was the "testimony regarding a two-year sentence in Federal prison. This obviously referred to Federal Sentencing guidelines, with which defendant would not likely be familiar. It is reasonable to assume that Mr. Colman, as an experienced, long-time agent, would have been familiar with these guidelines. Yet, he denied that he was."[19]

---

*Q.* Are you aware of any change in any policy since the date of this incident?

*A.* The policy on referral to State or Federal?

*Q.* That's correct.

*A.* No, there's no policy.

*Q.* On those cases which you have made a referral, does the DEA keep the drugs or do you turn them over to the local police?

*A.* In those cases, the Federal Government would keep the drugs.

[19] The judge said that the other DEA agent "acknowledged her own awareness of the fact that the (Federal) sentencing guidelines on the quantity of controlled substance with which the defendant was charged was 'roughly 24 to 36 months,' and that the State penalty for the same amount was mandatory life imprisonment."

Coleman's testimony that he did not have the authority to promise a specific sentence on the federal fifteen-year charge is not necessarily inconsistent with Ryan's testimony that he was advised that if he cooperated he would be sentenced to serve two to three years, the guidelines sentence.

The majority misstates the punishment to which Ryan was subject when it states: "federal prosecution for the same act [possession with

The judge found that "it has not been shown by the prosecution that even in Michigan, there is a policy of deferring to State prosecution, major controlled substance cases for prosecution under the harsher law."

II

Clearly, if Ryan had waived his Fifth Amendment privilege and, without consulting counsel, further incriminated himself by aiding the DEA in its efforts to locate the other two kilograms of cocaine, he would, if Coleman had kept his word, have been prosecuted in a federal court and would have been sentenced to a relatively short term of imprisonment. Ryan did not so cooperate, and the DEA turned the evidence it had compiled against him over to state law enforcement officials, resulting in a prosecution in state court and the imposition of a mandatory life sentence without possibility of parole.

The Recorder's Court judge found that the DEA acted vindictively. Whether that characterization is justified or a less pejorative or derogatory word would more appropriately characterize the DEA conduct should not be the focus of our inquiry or analysis.

Ryan had a right to remain silent. He was under no duty to negotiate with the DEA.[20] The judge, on ample evidence, found that Ryan was penalized because he sought to consult with a lawyer before further incriminating himself. And, thus, he was penalized for exercising his Fifth Amendment rights.

---

intent to distribute one kilogram of cocaine] carries only a possible sentence of twenty-four to thirty-six months in jail." *Ante*, p 33. Ryan was subject to prosecution under a federal statute providing a maximum sentence of fifteen years. 21 USC 841(b)(1)(B)(ii)(II).

Because of his particular history, Ryan was eligible for a twenty-four to thirty-six month sentence under the federal sentencing guidelines.

[20] Nor was the DEA under a duty to negotiate with Ryan.

There is a body of law concerning claims of vindictive action by judges[21] and prosecutors.[22] This case concerns a claim of vindictiveness against a law enforcement officer. The majority states:

> It is a violation of due process to punish a person for asserting a protected statutory or constitutional right. *North Carolina v Pearce*, 395 US 711; 89 S Ct 2072; 23 L Ed 2d 656 (1969); *People v Goeddeke*, 174 Mich App 534, 536; 436 NW2d 407 (1988). "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort . . . ." *Bordenkircher v Hayes*, 434 US 357, 363; 98 S Ct 663; 54 L Ed 2d 604 (1978). [*Ante*, pp 35-36.]

The majority also states that actual prosecutorial vindictiveness "will be found only where objective evidence of an *'expressed hostility or threat'* suggests that the defendant was deliberately penalized for his exercise of a procedural, statutory, or constitutional right." *Ante*, p 36 (emphasis added). Neither the words "expressed hostility or threat," nor a similar phrase appears in *Goodwin*, n 12, which is set forth in the margin.[23] *United States v Gallegos-Curiel*, 681

---

[21] E.g., *North Carolina v Pearce*, 395 US 711; 89 S Ct 2072; 23 L Ed 2d 656 (1969).

[22] E.g., *United States v Goodwin*, n 3 *supra*.

[23] *Goodwin* reads:

> In rejecting a presumption of vindictiveness, the Court in *Bordenkircher* did not foreclose the possibility that a defendant might prove through objective evidence an improper prosecutorial motive. In the case before it, however, the Court did not find such proof in the fact that the prosecutor had stated explicitly that additional charges were brought to persuade the defendant to plead guilty. The fact that the prosecutor threatened the defendant did not prove that the action threatened was not permissible; the prosecutor's conduct did not establish that the additional charges were brought solely to "penalize" the defendant and could not be justi-

F2d 1164, 1168 (CA 9, 1982), in which the quoted language appears, does not establish that actual vindictiveness can only be found where there is expressed hostility or threat. *Gallegos-Curiel*, and the cases cited in that opinion[24] consider and discuss the presumption of vindictiveness, not actual vindictiveness.

## III

When Ryan asked to speak to a lawyer, further interrogation should have ceased. *Miranda v Arizona*, 384 US 436, 474; 86 S Ct 1602; 16 L Ed 2d 694 (1966); *Edwards v Arizona*, 451 US 477, 484-485; 101 S Ct 1880; 68 L Ed 2d 378 (1981).[25]

The United States government may not, consistent with *Miranda* and *Edwards*, punish an accused for exercising his privilege against self-incrimination and his right to counsel.

The judge's findings—not discussed by the majority—that the DEA turned the evidence that it had compiled against Ryan over to state law enforcement officers to punish him for exercising his right to counsel are amply supported and were not clearly erroneous. Thus, his decision should be affirmed.

The judge's findings are consistent with Coleman's testimony that he sought Ryan's cooperation and offered to "defer" state prosecution that would result in a sentence of life imprisonment, and to prosecute instead in a

---

fied as a proper exercise of prosecutorial discretion. [457 US 380, n 12.]

[24] *United States v Hollywood Motor Car Co*, 646 F2d 384 (CA 9, 1981), rev'd on other grounds 458 US 263; 102 S Ct 3081; 73 L Ed 2d 754 (1982), and *United States v DeMarco*, 550 F2d 1224 (CA 9, 1977).

[25] Similarly, see *Minnick v Mississippi*, 498 US 146; 111 S Ct 486; 112 L Ed 2d 489 (1990); *Arizona v Fulminante*, 499 US 279; 111 S Ct 1246; 113 L Ed 2d 302 (1991).

federal court with a comparatively short sentence, if Ryan would cooperate.

The judge's findings are also consistent with Coleman's testimony that "some" multiple kilogram cases are prosecuted in federal court, and the prosecution's failure to show that any other multi-kilogram case was transferred to the state for prosecution. The judge's findings are also consistent with the other DEA agent's testimony that the DEA, in her six years with the DEA, did not turn over for state prosecutions persons apprehended with a kilogram of cocaine.

The United States government has the resources to prosecute such major offenders. It is not surprising that, after expending considerable effort to apprehend a drug trafficker engaged in major activity, the DEA, the attorney general, and local United States attorneys ordinarily proceed to prosecute offenders under federal law and do not refrain from prosecuting, and do not "defer" to state prosecution by turning the offender over to state authorities.

The judge observed:

> Had there been a showing by evidence of a Federal policy of referring such cases as this to state courts for porsecution [sic], the case might be viewed a little differently. While the State of Michigan, through legislative enactment, has expressed a clear public policy of the state by mandating that offenders involved with 650 grams or more of the prohibited substances be sentenced to life imprisonment, the United States Congress had expressed a decidedly different national public policy.

Congress, not a DEA agent, enacts laws expressing governmental policy. A DEA agent is not a private citizen who might report crime he happens to observe. A DEA agent has been provided the resources to investigate, obtain evidence, and arrest offenders, and the

power he possesses, to enforce United States governmental policy, not his own personal choices. The sentencing guidelines presumably reflect congressional intent.

The Recorder's Court judge discredited Coleman's assertion that he had discretion "to go Federal or State." It would not be consistent with congressional intent for the DEA to purport to confer on a DEA agent discretion to refer multi-kilogram cases to state authorities when he personally believes that a life sentence without parole is more appropriate than the fifteen-year penalty (and guideline sentence) established by the Congress. Absent evidence, in addition to Coleman's discredited assertion, that the DEA had conferred authority on him to turn Ryan over for state prosecution because Coleman was of the opinion that the state's penalty structure was more appropriate than the federal structure, the Recorder's Court judge did not err in rejecting Coleman's testimony that he had discretion "to go Federal or State."

To be sure, a DEA agent may offer concessions in the prosecution of *federal offenses* in exchange for cooperation leading to the arrest of other offenders. (The guideline sentence offered was not such a concession.) But he must do so within constitutional limitations. DEA agents have not been authorized by the Congress to punish, nor may a DEA agent, consistent with the Constitution of the United States punish, an offender for exercising his rights under the Fifth Amendment respecting self-incrimination and the assistance of counsel.

IV

The State of Michigan is, indeed, a separate sovereign and may, although the conduct involved is also violative of federal law, prosecute for violation of its laws at least where, as here, the federal government has not prosecuted for violation of federal law.[26]

As the Recorder's Court judge found,[27] this was not, however, a case in which federal and state law enforcement officers were jointly investigating and together apprehended a drug trafficker. State law enforcement officers were not meaningfully involved in Ryan's apprehension. But for the conduct of the DEA in turning over to the state the evidence the DEA had compiled as punishment for Ryan's exercise of his rights, the state is not likely to have become aware of the evidence against Ryan compiled by the DEA, and probably would have little, if any, evidence with which to prosecute.[28]

---

[26] We do not dispute the following assertions of the majority:

[T]he Wayne County prosecutor had independent authority to pursue charges against this defendant regardless of any "deal" suggested by the federal agent. [*Ante*, p 38.]

We find that the mere threat to refer the case for state prosecution does not amount to objective evidence of hostile motive because it came from an individual who lacked authority to prohibit the Wayne County prosecutor from exercising his legitimate power to prosecute violations of Michigan law. [*Ante*, p 37.]

Again, we do not dispute the assertion that Coleman lacked authority to prohibit the Wayne County prosecutor from exercising his power to prosecute violations of Michigan law. There was, however, more here than a "mere threat." The trial judge found, with ample evidence to support that finding, that the DEA turned over the evidence that it had compiled against Ryan to the state for prosecution to punish him for exercising protected rights.

[27] See n 16 and accompanying text.

[28] The trial record in the instant case indicates that the only witnesses at the trial other than a DEA informant and DEA agents or employees were a hotel security guard, a hotel desk clerk, and a Livonia police officer. The security guard and the desk clerk testified concerning the

If the state has evidence obtained before or without regard to whether the DEA had turned over its file to the state, the state may, I agree with the majority, properly prosecute Ryan for major drug activity. But it would be contrary to the Supremacy Clause[29] for the state to prosecute Ryan with evidence obtained by the state as a result of conduct of the United States—punishing Ryan for exercise of protected rights—barred by *Miranda* or *Edwards* or the Fifth and Fourteenth Amendments.[30]

V

The majority appears to address a double jeopardy issue that was not briefed and argued when it states:

> Implicit in the trial court's reasoning is that the state would have been unable to prosecute defendant if the federal government had also pursued charges. But the state has independent authority to prosecute crimes within its borders. [*Ante*, pp 37-38.]

The issue whether the state may prosecute after the federal government has also prosecuted for a drug offense is pending before this Court in *People v Hermiz* (Docket No. 101689) and *Mezy* (Docket No.

---

conduct of Ryan's "partner." The police officer testified that Ryan did not have a gun or any money in his possession.

[29] This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. [US Const, art VI.]

[30] Ordinarily, the remedy for violation of *Miranda* or *Edwards* is the suppression of statements obtained in violation of the rights there recognized. Where, however, suppression of statements will not rectify the wrong, the court is obliged to fashion a remedy that will do so. See *Cooper v Dupnik*, 963 F2d 1220 (CA 9, 1992) (en banc); *Flanigan v Kent Co Sheriff's Dep't*, 817 F Supp 660 (WD Mich, 1993).

102274), argued January 10, 1996 (Calendar No. 13).*
It is not appropriate for the Court to speak to this
issue before it decides *Hermiz* and *Mezy*.

CAVANAGH and MALLETT, JJ., concurred with LEVIN, J.

---

*Decided July 31, 1996, 453 Mich 269; 551 NW2d 389—REPORTER.