*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MICHAEL GEORGIE CARSON,

Defendant-Appellant.

UNPUBLISHED
May 06, 2026
10:07 AM

No. 355925
Emmet Circuit Court
LC No. 20-005054-FC

## ON REMAND

Before: REDFORD, P.J., and BOONSTRA and MALDONADO, JJ.

PER CURIAM.

This case returns to this Court on remand from our Supreme Court for further proceedings. Defendant was convicted of several crimes related to his taking money and personal property from his neighbor. In defendant's appeal of right, he argued that the warrant obtained by police officers to search his cell phone violated the particularity requirement of the Fourth Amendment. The Supreme Court affirmed this Court's holding that the search warrant was constitutionally deficient because it lacked sufficient particularity to satisfy the requirements of the Fourth Amendment, but the Supreme Court reversed this Court's conclusion that defendant's trial counsel was ineffective for failing to raise that issue below. *People v Carson*, ___ Mich ___, ___; ___ NW3d ___ (2025) (Docket No. 166923); slip op at 31. On remand, we now consider the remaining arguments that defendant made in his appeal of right.

For the reasons set forth below, we vacate the convictions of receiving or concealing stolen property and the attendant conspiracy on double-jeopardy grounds but otherwise affirm.

## I. BACKGROUND

Our prior opinion in this case provided the following summary of the underlying facts:

-1-

This case arises from a jury's conclusion that defendant and his romantic partner, Brandie DeGroff, stole nearly $70,000 from their neighbor's safe. Thus, defendant was found guilty of safebreaking, MCL 750.531; larceny of property valued at $20,000 or more, MCL 750.356(2)(a); receiving or concealing stolen property valued at $20,000 or more, MCL 750.535(2)(a); larceny from a building, MCL 750.360; and conspiracy to commit each of those offenses, MCL 750.157a. Defendant was sentenced to serve concurrent terms of 10 to 20 years' imprisonment for the safebreaking conviction, 9 to 20 years' imprisonment each for the larceny-of-property and receiving-or-concealing convictions, and 3 to 15 years' imprisonment for the larceny-from-a-building conviction, plus terms for each conspiracy conviction matching the sentence for its underlying offense. . . .

\* \* \*

Defendant and DeGroff were neighbors of Don Billings. Billings, because of his various health problems, was planning to sell much of his property so that he could eventually move in with his brother. Defendant had experience with selling goods online, so Billings enlisted the assistance of defendant and DeGroff with selling his property in exchange for them receiving 20% of the proceeds. Defendant was given keys to Billings's home and was also granted license to look through and rearrange much of Billings's property. This operation was ongoing from the summer of 2019 until September or October of the same year.

Billings did not trust banks, so he stored his life's savings, along with miscellaneous other documents and valuable goods, in a pair of 40-year-old safes that he kept in his house. The cash was estimated to equal more than $60,000, and it was in one-hundred-dollar-bills that were divided into $1,000 bundles. The safes could be opened by combination or key, but Billings only used the combination and could not remember where in the house he stored the key. At some point after defendant and DeGroff were no longer assisting Billings, he decided for no particular reason to open the safes. However, he was not able to make the combinations work and ultimately needed to elicit the assistance of a locksmith. Upon opening the safes, Billings discovered that all of the cash was gone. Billings testified that between then and the last time he had opened the safe, only defendant and DeGroff had access to them. However, he never gave them permission to open the safes or attempt to sell any of the safes' contents.

Other circumstantial evidence connected defendant and DeGroff to the theft of the contents of the safes. For example, the police obtained records from a jewelry store indicating that defendant had purchased a $1,490 wedding ring on August 6, 2019. The police also obtained a search warrant for records regarding defendant and DeGroff's joint bank account for each month from October 2018 to November 2019. These records indicated that they had $283.13 in the account at the end of July 2019; that they deposited a total of $9,300 in September 2019; and that their September deposits exceeded every other month during that period by approximately $4,000. However, defendant's employer from April 2, 2019 until August 2, 2019, testified that defendant's net pay during that entire period was

-2-

approximately $8,400. He further testified that defendant quit because, according to defendant, "he ran across some money and some valuables, gold I believe, in a locker that he bought online, or through some kind of a transaction[,] . . . so, [defendant] had a lot of money that [sic] he didn't need to work for a while, or something." Alan Olsen, who lived with and paid rent to defendant and DeGroff from August 2018 until September 2019, testified that the couple was having financial difficulties and that he had paid extra rent the final month he lived there to help them.

However, Olsen also testified that in August 2019, the couple began going out "every night," and they would tell him that they were either getting dinner or going to the casino.

Finally, the slot director of the Odawa Casino testified that the casino used "players club cards" to track players' earnings because once a certain threshold was exceeded the earnings were subject to income taxation. He explained that the machines at the casino tracked the total money that a player put into the machine, irrespective of wins or losses. In 2019, defendant put a total of $122,000 into the gaming machines at the Odawa Casino, including approximately $57,000 in August. In 2019, defendant's total losses were approximately $5,000, including just shy of $4,000 in losses in August. Meanwhile, Brandy DeGroff put $47,619 into gaming machines at the Odawa Casino in 2019, including $12,919 in August. DeGroff lost $6,021 in 2019, including $2,368 in August.

Defendant was arrested on February 26, 2020. Police arrived at defendant's home at approximately 4:00 a.m., and defendant answered the door wearing only shorts. Prior to escorting him out, Emmet County Sheriff's Detective Tyler Midyett allowed defendant to smoke a cigarette and get dressed. Detective Midyett escorted defendant to his bedroom to get dressed, and while defendant was sitting on his bed tying his shoes, Detective Midyett noticed a cell phone connected to a charger nearby. Detective Midyett asked defendant if the cell phone was his, defendant answered in the affirmative, and the phone was seized. Later, police sought and obtained a warrant to search the phone's contents and discovered text messages exchanged between defendant and DeGroff that proved to be critical to the prosecution's case. [*People v Carson*, ___ Mich App ___, ___-___; ___ NW3d ___ (2024) (alterations in original; footnote omitted) (Docket No. 355925); slip op at 1-3.]

## II. APPELLATE PROCEEDINGS

On appeal, defendant raised numerous arguments—mostly framed as claims of ineffective assistance of counsel—regarding the search and seizure of his phone, as well as a contention that his convictions of both larceny and receiving or concealing stolen property violated the prohibition against multiple punishments. A majority of this Court reversed defendant's convictions, holding that

-3-

> it violates the prohibition against multiple punishments for the same offense for a person to be convicted of both larceny and receiving or concealing stolen property when the convictions arise from the same criminal act because a person who steals property necessarily possesses stolen property. Furthermore, it is well established that a search made pursuant to a general warrant cannot stand; thus, . . . the warrant authorizing the search of defendant's cell phone violated the particularity requirement because it authorized a general search of the entirety of the phone's contents. Finally, . . . the fruits of this search cannot be saved by the good faith exception to the exclusionary rule because the warrant was plainly invalid. [*Id.* at ___; slip op at 1-2.]

This Court declined to address other matters raised by defendant because "these holdings [were] sufficient to wholly resolve this appeal and provide guidance on remand." *Id.* at ___; slip op at 2.

The prosecution appealed to the Supreme Court, which granted leave. *People v Carson*, ___ Mich ___; 11 NW3d 269 (2024) (Docket No. 166923). In an opinion by Chief Justice CAVANAGH, joined by Justices WELCH and THOMAS, with Justice BOLDEN concurring in pertinent part, the Supreme Court affirmed this Court's holding that the search warrant at issue did not describe the scope of the search with sufficient particularity to satisfy the requirements of the Fourth Amendment. *Carson*, ___ Mich at ___; slip op at 1; *id.* at ___ (BOLDEN, J., concurring in pertinent part and dissenting in part); slip concurrence & dissent at 1.

However, in the lead opinion, now with Justices ZAHRA and BERNSTEIN concurring, the Supreme Court reversed this Court's conclusion that defendant was entitled to reversal on the basis of the ineffective assistance of his trial counsel for failing to move to suppress the contents of his cell phone. *Id.* at ___; slip op at 1-2; *id.* at ___ (ZAHRA, J., concurring in the result only); slip concurrence at 1; *id.* at ___ (BERNSTEIN, J., concurring in the result); slip concurrence at 1. The lead opinion explained that "the application of Fourth Amendment principles in the cell-phone and digital-data sphere is an area of the law that continues to rapidly evolve" and noted that the primary case supporting its conclusion that there was a Fourth Amendment violation "was not decided until more than six months after counsel filed his unsuccessful motion to suppress." *Id.* at ___; slip op at 29, citing *People v Hughes*, 506 Mich 512; 958 NW2d 98 (2020). Accordingly, "counsel's decision to file a motion to suppress on a different basis was not based on a misunderstanding of the law as it existed at the time and may be fairly characterized as an exercise of reasonable professional judgment under the facts and circumstances that existed when the decision was made." *Carson*, ___ Mich at ___; slip op at 30.

The Supreme Court left intact this Court's conclusion that defendant's convictions of both larceny and receiving or concealing stolen property, as well as both attendant conspiracy charges, violate double-jeopardy principles, because the prosecution raised no such challenge. *Id.* at ___ n 1; slip op at 2 n 1. The Court's lead opinion remanded the case to this Court to "address additional arguments that defendant made in his appeal of right." *Id.* at ___; slip op at 31.

## III. CELL PHONE SEIZURE

Defendant argues that the warrantless seizure of his cell phone exceeded the scope of a search incident to an arrest and that his trial counsel's assistance was ineffective when he failed to raise this specific argument in his motion to suppress the evidence of the seizure. We disagree.

We review "de novo a trial court's ultimate decision on a motion to suppress," but review for clear error "the trial court's underlying findings of fact. . . ." *People v Beuschlein*, 245 Mich App 744, 748; 630 NW2d 921 (2001). The Fourth Amendment to the United States Constitution provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Our state Constitution similarly states that "[t]he person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures," and that "[n]o warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation." Const 1963, art 1, § 11. The state constitutional guarantee is generally understood to be coextensive with the federal one. See *People v Mead*, 503 Mich 205, 212; 931 NW2d 557 (2019).

Evidence obtained in the course of violating a suspect's rights under the Fourth Amendment of the United States Constitution is subject to suppression at trial. *People v Cartwright*, 454 Mich 550, 557-558; 563 NW2d 208 (1997). See also *Mapp v Ohio*, 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961) (incorporating the Fourth Amendment against the states under the Fourteenth Amendment). "Additionally, the exclusionary rule prohibits the introduction into evidence of materials and testimony that are the products or indirect results of an illegal search, the so-called 'fruit of the poisonous tree' doctrine." *People v Stevens*, 460 Mich 626, 633-634; 597 NW2d 53 (1999), citing *Wong Sun v United States*, 371 US 471, 487-488; 83 S Ct 407; 9 L Ed 2d 441 (1963).

"Searches and seizures conducted without a warrant are unreasonable per se, subject to several specifically established and well-delineated exceptions." *People v Borchard-Ruhland*, 460 Mich 278, 293; 597 NW2d 1 (1999). One such exception is a search incident to a lawful arrest. *United States v Robinson*, 414 US 218, 224; 94 S Ct 467; 38 L Ed 2d 427 (1973). "This general exception has historically been formulated into two distinct propositions. The first is that a search may be made of the person of the arrestee by virtue of the lawful arrest. The second is that a search may be made of the area within the control of the arrestee." *Id*.

"There are two historical rationales for the 'search incident to arrest' exception: '(1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at trial.' " *People v Nguyen*, 305 Mich App 740, 756; 854 NW2d 223 (2014), quoting *Knowles v Iowa*, 525 US 113, 116; 119 S Ct 484; 142 L Ed 2d 492 (1998). The United States Supreme Court elaborated as follows:

-5-

When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area within his immediate control—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The adherence to judicial processes mandated by the Fourth Amendment requires no less. [*Chimel v California*, 395 US 752, 762-763; 89 S Ct 2034; 23 L Ed 2d 685 (1969) (quotation marks and citation omitted).]

In this case, in its opinion and order denying the motion to suppress, the trial court recounted that, at the suppression hearing, Detective Leirstein testified that in his experience, cell phones often contain evidence of crime. And Deputy Midyett testified that there is a concern that if not seized, any evidence on the phone could be lost. The trial court then compared the present case to *People v Giacalone*, 23 Mich App 163; 178 NW2d 162 (1970), in which the arresting officers suggested the defendant go to the bedroom to change his clothes. As the defendant approached his dresser to get socks, the officers stopped him and searched the dresser, seizing "a small arsenal of weapons." *Id*. at 170.

On appeal, the *Giacalone* Court rejected the argument that "the search . . . was not truly incidental to an arrest," but rather was "a subterfuge to make an otherwise impermissible search of one's premises." *Id*. at 167. The Court expressed concern that "[t]he obvious existence of another purpose on the part of the police officers, other than making an arrest and a search reasonably incident thereto, tends to becloud the arrest and its incidental search." *Id*. at 170. However, the Court nonetheless concluded that the identified ulterior motive for the arrest only indicated a "dual purpose," which neither invalidated the valid arrest nor impugned the search insofar as it was incidental to that arrest. *Id*. at 172. Therefore, the search was upheld, and the evidence was admitted. *Id*. at 170.

The trial court in the present case analogized to *Giacalone*, noting that in both cases, there was a valid warrant for defendant's arrest. But in this case, the suggestion to change clothes came from defendant's wife, not the officers. Moreover, officers warned defendant that they would have to accompany him as he moved through the home, and he did not go anywhere he did not choose to go. When he sat on the bed next to the nightstand to put on his socks, his cell phone was in his

immediate reach. Defendant knew during this time that he was under arrest. Further, as DeGroff was a suspected co-conspirator and was to remain in the residence, officers were validly concerned that she could access the phone and destroy any evidence contained therein. The trial court thus concluded that the arresting officers seized defendant's phone as part of a "dual purpose" to their arrest after he chose to go to his bedroom and place his cell phone within his "immediate area of control," and therefore, the seizure was pursuant to a valid search incident to a lawful arrest. We find no fault with this analysis.

Defendant acknowledges that the "dual purpose in *Giacalone* was not enough to vitiate the presumption that the officers were there to make an arrest" in that case. But defendant attempts to distinguish the instant case by arguing that police officers timed the arrest specifically in hopes of finding defendant in need of a change of clothes, thus providing them an opportunity to accompany him to various parts of his house which they might then look for evidence to seize. However, defendant cites no authority for the proposition that the police may not opportunistically time their arrests or that they must execute arrest warrants in ways intended to minimize their opportunities to spot and seize evidence.

Defendant further attempts to distinguish *Giacalone* by noting that the latter involved the search of a sock drawer that the arrestee had opened, while, in this case, defendant "neither directly nor implicitly made any suggestion that he wanted to pick up his phone for any reason." Defendant thus implies that the seizure of his phone in this case was improper because he did not focus his attention on it. But United States Supreme Court in *Chimel* held that a search incident to arrest may cover "the arrestee's person and the area within his immediate control—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence," without suggesting that the arrestee must gesture as if to gain actual possession of such items before the police may seize them. *Chimel*, 395 US at 763.

Defendant also grafts onto his argument for this issue an assertion that defense counsel was ineffective for having presented arguments for suppression relating only to "consent, probable cause, and plain view," while failing "to argue the issue of the scope of the search incident to arrest exception to the warrant requirement." However, as noted, the trial court recognized that the main issue was whether the seizure was within the scope of the incident-to-arrest exception. To the extent that the court did so in response to innuendoes it gleaned from defense counsel's arguments, counsel's performance was not deficient. To the extent that the court did so on its own initiative, the court thereby cured any deficiency in how trial counsel presented the issue.

For these reasons, we affirm the trial court's conclusion that the police were operating with a dual purpose when they arrested defendant and thus were entitled to seize his cell phone as part of a search incidental to that arrest.

## IV. CUSTODIAL STATEMENT

Defendant argues that when Deputy Midyett accompanied defendant to his bedroom after placing defendant under arrest, defendant was in custody, and thus Midyett's question whether a nearby cell phone belonged to defendant was a custodial interrogation. Because Midyett had not

advised defendant of his *Miranda*[1] rights, defendant argues that his answer to that question was subject to suppression, and his trial counsel's assistance was ineffective for failing to seek suppression on this basis. We disagree.

## A. STANDARDS OF REVIEW

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). Defendant concedes that this issue was raised for the first time in his motion for new trial or evidentiary hearing as a substantive error and was the result of ineffective assistance of trial counsel. This Court reviews unpreserved evidentiary issues for plain error affecting substantial rights. *People v Pesquera*, 244 Mich App 305, 316; 625 NW2d 407 (2001). An error is plain if it is clear or obvious, and an error affects substantial rights if it affects the outcome of the proceedings. *People v Jones*, 468 Mich 345, 355; 662 NW2d 376 (2003). Even if these elements are established, however, "[r]eversal is warranted only when the plain, unpreserved error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of the defendant's innocence." *Id*.

## B. ANALYSIS

"Statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waives his Fifth Amendment rights." *People v Howard,* 226 Mich App 528, 538; 575 NW2d 16 (1997), citing *Miranda v Arizona,* 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966), and *People v Garwood*, 205 Mich App 553, 555-556; 517 NW2d 843 (1994). Additionally, as noted, the exclusionary rule prohibits the introduction into evidence of the "fruit of the poisonous tree." *Stevens*, 460 Mich at 633-634, citing *Wong Sun*, 371 US at 487-488. However, " 'the *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted.' The . . . 'fruits of the poisonous tree' doctrine does not control where there is no constitutional violation." *People v Melotik*, 221 Mich App 190, 199; 561 NW2d 453 (1997) (quotation marks and citations omitted).

After Detective Midyett placed defendant under arrest, he accompanied defendant to his bedroom so that he could get dressed. At that time, Detective Midyett spotted a cell phone and asked defendant if it was his. Defendant unhesitatingly answered that it was his and handed the phone to Midyett. At the *Ginther* hearing, defendant's trial counsel testified that he never sought suppression of defendant's affirmative response to that inquiry, but that he "may have" discussed that possibility with defendant. For his part, defendant denies that such a discussion took place.

The trial court found that "[f]rom an objective standpoint, it would have been reasonable and prudent to file a motion to suppress the statement. But the critical factor is whether filing the motion would have changed the outcome of the case." On this point, the trial court determined

---

[1] *Miranda v Arizona,* 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

that even if defendant's response had been suppressed, there was additional evidence of his ownership of the phone, noting that "[t]he phone was seized from Defendant's bedroom. The jury reviewed text messages that were downloaded from the phone. Many of those messages identified defendant as the sender and recipient by virtue of the content of the conversations."

We agree that defendant's intimate relationship with DeGroff was very much in evidence, and that the text conversations in which she was identified as one of the participants obviously implicated defendant as the other when DeGroff was listed in the contacts as "My love," the two discussed matters related to Billings's household, and the two also touched on matters of relationship intimacy, such as anger, stress, sleeplessness, financial problems, and how "everyone at home is in line of fire and it's not fair to all of you." Therefore, to the extent that it was plain error for Detective Midyett to testify that defendant confirmed that the subject phone was his, that error did not affect the outcome of trial or place the integrity of the proceedings into doubt, and thus appellate relief is not warranted under the plain-error rule. See *Jones*, 468 Mich at 355.

Defendant also contends that his trial counsel's assistance was ineffective because he failed to seek suppression of the statement at issue. As we will discuss more thoroughly in the issues that follow, deficient performance on the part of a criminal defense attorney does not warrant a new trial unless the defendant shows that the poor performance rendered the result of the proceeding fundamentally unfair or unreliable, and that there is a reasonable probability that without the error the result would have been different. *People v Messenger*, 221 Mich App 171, 181; 561 NW2d 463 (1997). Because the trial court did not clearly err in finding that the jury would have learned of defendant's ownership of the subject phone even without hearing that defendant himself had said so, defendant has shown no prejudice as the result of defense counsel's failure to seek suppression. See *id*.

## V. RETALIATION

Defendant argues that the prosecution vindictively added conspiracy charges in retaliation for defendant moving to suppress the seizure of his cell phone. Consequently, defendant's trial counsel's assistance was ineffective when he declined to move to quash the conspiracy charges or seek a preliminary examination regarding the same. We disagree.

### A. STANDARDS OF REVIEW

Review of a trial court's decision following a *Ginther* hearing presents a mixed question of fact and law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The factual aspect is reviewed for clear error, and the legal aspect is reviewed de novo. *Id*. "In reviewing a defendant's claim of ineffective assistance of counsel, the reviewing court is to determine (1) whether counsel's performance was objectively unreasonable and (2) whether the defendant was prejudiced by counsel's defective performance." *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). Regarding the latter, the defendant must show that the result of the proceeding was fundamentally unfair or unreliable, and that there is a reasonable probability that, but for counsel's poor performance, the result would have been different. *Messenger*, 221 Mich App at 181.

## B. ANALYSIS

A prosecutor has broad discretion in deciding what charges to bring. See *People v Jones*, 252 Mich App 1, 6; 650 NW2d 717 (2002). Accordingly, "unless there is some reason to conclude that the prosecution's acts were unconstitutional, illegal, or ultra vires, the prosecution's decision whether to proceed with a case is exempt from judicial review." *Id*. at 7. However, "[i]t is a violation of due process to punish a person for asserting a protected statutory or constitutional right." *People v Ryan*, 451 Mich 30, 35; 545 NW2d 612 (1996). This type of punishment is called prosecutorial vindictiveness, and it may be actual or presumed. *Id*. "Actual vindictiveness will be found only where objective evidence of an expressed hostility or threat suggests that the defendant was deliberately penalized for his exercise of a procedural, statutory, or constitutional right." *Id*. (quotation marks and citation omitted). "The burden is on the defendant to affirmatively establish actual vindictiveness." *Id*.

In this case, defendant neither alleges actual vindictiveness, nor suggests that the prosecuting attorney expressly threatened to bring conspiracy charges if defendant proceeded with his motion to suppress the seizure of his cell phone. Defendant thus relies on a theory of presumed vindictiveness.

> Whether a presumption of prosecutorial vindictiveness applies requires an inquiry into the realistic likelihood of vindictiveness in the particular fact situation. Where the defendant provides evidence sufficient to support a presumption of prosecutorial vindictiveness, the burden shifts to the government to produce objective evidence that its motivation in charging the defendant was lawful; that burden is admittedly minimal, as any objective evidence justifying the prosecutor's actions will suffice. [63C Am Jur 2d, Prosecuting Attorneys, § 23, p 165 (citations omitted).]

The federal Sixth Circuit has held that a court may presume an improper vindictive motive when the party claiming vindictiveness establishes that "(1) the prosecutor has some stake in deterring the petitioner's exercise of his rights and (2) the prosecutor's conduct was somehow unreasonable." *Bragan v Poindexter*, 249 F3d 476, 482 (CA 6, 2001) (quotation marks and citation omitted).[2]

When the prosecutor amended the charges, it was not obvious that the earlier suppression motion would hurt the case, so it is speculative to say the amendment was retaliatory. Given the prosecutor's broad discretion to bring charges and the investigation's suggestion that a conspiracy might be involved, the record doesn't support the idea that the conspiracy counts were added out of vindictiveness. And failure to advance a meritless argument does not constitute ineffective assistance of counsel. *People v Ericksen*, 288 Mich App 192, 205; 793 NW2d 120 (2010).

---

[2] "While the decisions of lower federal courts . . . are not binding on this Court, they may be considered as persuasive authority." *People v Woodward*, 321 Mich App 377, 385 n 2; 909 NW2d 299 (2017).

Therefore, the trial court properly rejected defendant's claim that defense counsel was ineffective for not seeking to quash the conspiracy charges on a theory of prosecutorial vindictiveness.

Additionally, trial counsel was not ineffective for failing to move the trial court to remand the case for a preliminary examination on the added charges. After the *Ginther* hearing, the trial court summarized trial counsel's testimony and the court's findings as follows:

> Trial Counsel . . . testified that he decided to waive the original preliminary examination as the victim was older and not healthy. He did not want Billings' testimony preserved in the event he was not available for trial. He indicated that he followed similar trial strategy with the amended information.
>
> This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight. In this case, Trial Counsel's trial strategy did not fall below an objectionable standard of reasonableness.

Defendant protests that "[l]abeling something a strategy is not sufficient because it must also be sound" but fails to rebut the trial court's conclusion that defense counsel acted for legitimate strategic reasons in foregoing preliminary examinations. Nor does defendant suggest how, in light of the evidence extracted from his cell phone, the trial court might not have been persuaded that probable cause existed to support the conspiracy charges. Because defendant fails to show that he had anything to gain from a preliminary examination, he also fails to show that defense counsel's failure to request such a proceeding made his trial fundamentally unfair or unreliable or that there is a reasonable probability that counsel's challenged inaction affected the outcome. See *Messenger*, 221 Mich App at 181.

## VI. HOUSE SEARCH

Defendant argues that the evidence seized from execution of the warrant to search his house should have been suppressed because the affidavit in support of the warrant failed to establish probable cause for the search, and no reasonably well-trained officer would have believed that it established probable cause. We disagree.

As noted, the Fourth Amendment to the United States Constitution recognizes "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and requires that warrants be supported by "probable cause" and specify "the place to be searched, and the persons or things to be seized." See also Const 1963, art 1, § 11. Evidence seized in violation of a suspect's rights against unreasonable searches and seizures is subject to suppression at trial. See *Cartwright*, 454 Mich at 557-558.

Again, after a *Ginther* hearing, we review the trial courts factual findings for clear error and legal determinations de novo. *LeBlanc*, 465 Mich at 579. When reviewing a defendant's claim of ineffective assistance of counsel, we determine (1) whether counsel's performance was objectively unreasonable and (2) whether the defendant was prejudiced by counsel's defective performance. *Rockey*, 237 Mich App at 76. Regarding the latter, the defendant must show that the result of the proceeding was fundamentally unfair or unreliable, and that there is a reasonable

probability that, but for counsel's poor performance, the result would have been different. *Messenger*, 221 Mich App at 181.

At the *Ginther* hearing, defendant's trial counsel confirmed that the warrant for the search of defendant's residence included a long list of items of personal property and that the execution of the warrant resulted in the seizure of tax returns and counsel's notes and letters to defendant and DeGroff. When asked if he considered filing a motion to preclude use of information learned from those seizures, defense counsel replied, "I'm not aware that they used any information that they learned from those." Moreover, trial counsel's testimony indicated that he considered the warrant to be a mere formality because DeGroff had consented to the search.

After the *Ginther* hearing, the trial court did not assess the adequacy of the affidavit or validity of the warrant, but considered instead whether the police executed the warrant in good faith:

> . . . Again, assuming for the sake of argument that the Trial Court would have quashed the warrant, the crux of the issue is whether the outcome would have been different. Defendant argues that the good faith exception to the exclusionary rule does not apply because affiant lied in the affidavit for probable cause.

In particular, defendant argued in the trial court and on appeal that Detective Leirstein incorrectly averred in the warrant affidavit that he "observed a comment" in a text from DeGroff to defendant in which she stated that she aided him in stealing $60,000. At defendant's trial, Detective Leirstein described the text exchange as follows:

> *Q.* I want you to read for the jury the text message [defendant] sends [DeGroff] on October 29 at about 4:15 p.m. . . . What did [defendant] say to her?
>
> *A.* "Yeah, right. It's all you've done is use me and cheat on me."
>
> *Q.* . . . [DeGroff's] response . . . ?
>
> *A.* "Right. Um, use you for what? 'Cause I haven't made any money or help you steal sixty thousand dollars? And cheat? When? Tell me when I had the opportunity to fucking cheat? You are the one who didn't work most of the summer and hasn't held a single job."

At the *Ginther* hearing, defense counsel took the position that this exchange constituted DeGroff's *denial* of having assisted in the theft of $60,000, but he did not consider citing that as a basis for challenging the warrant because:

> When I truly looked at . . . the text . . . I realized the context that that was in, which was a fight about another woman . . . . When I read it, it looked to me like [DeGroff] was saying he took 60 grand, or she did. And I'm not sure where it came from either.

In contrast, the prosecuting attorney argued that the context of DeGroff's statement indicated that she was admitting to having helped defendant steal $60,000. The trial court concluded that the

prosecutor's interpretation was a reasonable one for purposes of the police's good-faith reliance on the warrant to search defendant's residence. We agree with the prosecution and trial court.

Additionally, the challenged affidavit stated that Billings had given defendant and DeGroff access to his home to sell items online, that Billings then discovered that a large amount of money and several items of personal property were missing, that text messages between defendant and DeGroff discussed looking for Billings's property in his home, and that those messages included an indication from DeGroff that she had aided defendant in stealing $60,000. The affidavit further indicated that defendant and DeGroff were generally in a state of financial hardship, but that defendant was suddenly seen with large amounts of money. Accordingly, even if the subject affidavit was arguably deficient in some respects, it was not so deficient that it precluded good-faith reliance by the police officers. We thus conclude that the trial court correctly held that the good-faith exception to the exclusionary rule applied to the execution of the warrant.

Therefore, we reject this claim of ineffective assistance on the grounds that a motion to suppress the evidence seized from the search of defendant's residence would have been unsuccessful, at trial or on appeal, and thus defendant cannot show that defense counsel's failure to pursue such a motion rendered the proceedings fundamentally unfair or unreliable, or reasonably might have affected the outcome. See *Messenger*, 221 Mich App at 181.

## VII. EVIDENTIARY OBJECTIONS

Defendant argues that his trial counsel was also ineffective for failing to present potentially exculpatory financial documents at trial and failing to prevent, or at least minimize, the introduction of damaging statements attributed to DeGroff. We disagree. The standard of review for each these claims of ineffective assistance of counsel are the same as previously stated.

## A. FINANCIAL RECORDS

Defendant first argues that his trial counsel failed to take advantage of certain financial records that would have challenged the prosecution's theory that defendant and DeGroff were in financial distress prior to stealing from Billings. However, in making this argument, defendant cites no document or exhibit other than his own affidavit provided with his "Post-Judgment Appendix," in which defendant stated that, "[d]uring trial preparation, [defense counsel] was informed about accounts Affiant had at 4-Front Credit Union and copies of those statements were obtained and provided to him," but that counsel failed to "discuss with me why he did not use those documents or present them as evidence." This lack of an offer of proof, both at the *Ginther* hearing and on appeal, defeats this claim. See *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999) (determining that the defendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel).

## B. HEARSAY TESTIMONY

Hearsay is testimony relating a person's unsworn, out-of-court assertions offered to prove the truth of the matter asserted, MRE 801(c). Hearsay is generally inadmissible, MRE 802, subject to several exemptions and exceptions as provided by the rules of evidence, MRE 801-805. In this

case, defendant argues that his trial counsel was ineffective for objecting to the following testimony from Don Billings:

> *Q.* Also as part of the detective's investigation, did you compile a list of items that were missing from your house?
>
> *A.* To best of my knowledge, yes.
>
> *Q.* And, you're aware Detective Leirstein executed a search warrant at the defendant's house after that?
>
> *A.* Yes.
>
> *Q.* And, did you get some of those items back?
>
> *A.* Yes, I did. Some of 'em.
>
> *Q.* Had the defendant or [DeGroff] told you that they had those items at their house?
>
> *A.* Well, yeah. . . . They—I knew they had some items down at the house, still, yes.
>
> *Q.* Had they ever tried to return those things to you?
>
> *A.* Yes.
>
> *A.* They did try to return those to you?
>
> *Q.* Well, . . . when I asked for 'em back, along with the key, yeah, that's when we got most of the stuff back then.

Defendant highlights Billings's answer, "Well, yeah," when asked if defendant or DeGroff had told him that they still possessed some of his property. Defendant is concerned that Billings did not distinguish between defendant and DeGroff as the person who provided that information. However, if Billings meant defendant, then the assertion was not hearsay because it was an admission from a party opponent. See MRE 801(d)(2)(A). If Billings meant both defendant and DeGroff, then the admission from defendant mitigated any harm from attributing the same assertion to DeGroff. See *People v Smith*, 87 Mich App 584, 592; 274 NW2d 844 (1978) ("The erroneous admission of hearsay testimony is harmless error where such testimony is merely cumulative and corroborative of earlier testimony").

And if Billings meant DeGroff alone, defense counsel had good reason to refrain from objecting, because the indication that DeGroff had communicated to Billings that she and defendant still had some of Billings's property comported with the defense theory that defendant

had dealt honestly with Billings all along.[3]  Indeed, defense counsel recognized this and said as much at the *Ginther* hearing.  When asked if he considered objecting to Billings's testimony about what DeGroff said, defense counsel stated, "that went along with our theory that [DeGroff] had always held those items out for Mr. Billings."  Accordingly, defendant fails to establish any deficiency in defense counsel's performance.

Defendant similarly faults defense counsel for failing to raise a hearsay objection in connection with Detective Leirstein's testimony explaining when he learned that some of Billings's property was still located at defendant's and DeGroff's residence:

> *Q*. Now, as part of your investigation, did you come to learn that [defendant and DeGroff] had some of Mr. Billings property at their house?
>
> *A*. Yes, sir, I did.
>
> *Q*. When did you learn that?
>
> *A*. When I first interviewed [DeGroff] at the beginning of this investigation, she said that she still had a few items of his at her house.

Leirstein's testimony about learning from DeGroff that some of Billings's property remained at defendant's and DeGroff's house, as with Billings's own such testimony, in fact largely aligned with the defense theory that defendant had dealt honestly with Billings all along.  As such, for the same reasons that it was not ineffective assistance to fail to object to Billings' testimony, it also was not ineffective to fail to object to Leirstein's testimony.

Defendant also takes issue with certain testimony from Carrie Swadling, the operator of a daycare service that formerly employed DeGroff.  Swadling testified that, during the summer of 2019, while DeGroff was still her employee, a crowd-funding campaign relating to a "helper-dog for a child" came to their attention.  Swadling continued as follows:

> *Q*. Did Brandy DeGroff ever talk to you about donating to that fundraiser?
>
> *A*. Yes.
>
> *Q*. What did she tell you?
>
> *A*. Just that she wanted to contribute to helping a little girl get the dog but that she didn't want to do so, publicly, she wanted it kept quiet.

---

[3] Further, Billings went on to testify that, "later on, the detective came up with some more stuff that I didn't remember," apparently referring to items of his recovered from execution of the search warrant, and this telling of having learned that defendant and DeGroff had kept some of Billings's property did not include any hearsay.  See *McRunels*, 237 Mich App at 185.

*Q*. So how is she gonna do that? How is she gonna donate and yet keep it quiet?

*A*. She did that through me. She gave me the money and I contacted the person and they met with me and I gave them the money.

*Q*. How much money did Brandy give you?

*A*. In total, sixteen hundred dollars.

\* \* \*

*Q*. Did Brandy mention anything about [defendant], about his knowledge of this donation?

*A*. She did not want him to know because evidently the money had been won at the casino and, from the way I understood it, he had doled out money for her to play with but, any proceeds were supposed to come back to him and she did not give it all to him, she kept some.

*Q*. So did she tell you not to tell [defendant] about this donation?

*A*. Yes.

When asked at the *Ginther* hearing if he had considered objecting to Swadling's testimony about what DeGroff said, defense counsel explained:

I guess I did, but at the time in my mind I didn't think it was hearsay, just because she was saying, you know, would you keep this quiet. It wasn't assertion made for the truth of the matter for certain really. It was just conversational, you know, here's a thousand dollars; oh, by the way, would you keep this quiet.

. . . I guess at that point I didn't think it was hearsay. Maybe I was wrong, but at that point I wasn't sure it was. Certainly not enough to interrupt the trial and make it more of a point than it was.

Defense counsel thus recognized that the now-challenged testimony was damaging in that it indicated defendant had suddenly experienced a windfall. Counsel thus reasonably calculated that the better strategy was not to draw attention to it by raising an objection—particularly considering that the trial court might not sustain it. See *People v Isrow*, 339 Mich App 522, 532; 984 NW2d 528 (2021) (declining to raise an objection may be consistent with a sound trial strategy). We also note that Swadling's account of DeGroff's explanation for receiving apparent windfall money from defendant included DeGroff's innocent explanation. Accordingly, defense counsel's assistance was not ineffective for declining to raise a hearsay objection.

## C. HEARSAY TEXT MESSAGES

Defendant contends that defense counsel failed to demand a proper foundation for Detective Leirstein's testimony identifying DeGroff as the person conversing with defendant in the text messages in evidence. Defendant additionally argues that defense counsel should not have stipulated to the introduction of certain text messages.

At the *Ginther* hearing, when asked why he did not object to Detective Leirstein's testimony identifying DeGroff as the person conversing with defendant in the text messages, defense counsel explained that "when you look at the other thousand pages, it's fairly clear from the context that it was [DeGroff]." This explanation concerning DeGroff's identity as defendant's texting partner is quite plausible. As discussed previously, Detective Midyett testified that defendant readily admitted that the subject cell phone was his, and other evidence indicated that he was one of the persons exchanging the texts in evidence. It was also apparent that DeGroff was the other person in the text exchange based on the things in evidence that we have already noted, such as the discussions relating to their joint access to Billings's household, the fact that DeGroff was listed in defendant's contacts as "My love," and the fact that the conversations involved matters of relationship intimacy.

Moreover, the text messages would have implicated defendant as a thief and conspirator, even if the identity of the person he was communicating with had not been revealed. For these reasons, defense counsel would have had nothing to gain from challenging the foundation for specifying that DeGroff was defendant's texting partner.

Concerning defense counsel's stipulation to the admission of selected texts, he admitted that he did not gain many concessions from the prosecutor in exchange for his stipulation except "brevity of trial." Defense counsel determined that he "could either have a pile of evidence that was this high sitting on the prosecutor's table or, you know, a few pages." On appeal, defendant does not identify anything that defense counsel should have included in that stipulation that would have helped the defense. Moreover, defendant apparently acknowledges the strategic value of stipulating to limited portions of the messages "because opening up other portions of the phone content could easily have been counter-productive." Essentially then, defendant does not argue that defense counsel's strategy was unsound, just that defendant would have preferred to keep the text messages out of evidence altogether. However, "when reviewing an ineffective-assistance-of-counsel claim, the inquiry is not whether a defendant's case might conceivably have been advanced by alternate means." *People v Hieu Van Hoang*, 328 Mich App 45, 64; 935 NW2d 396 (2019) (quotation marks and citation omitted).

Moreover, defendant does not offer any legitimate basis for his preferred strategy of keeping the text messages out of evidence. The most damaging statement attributed to DeGroff was the message about helping defendant steal $60,000. The prosecuting attorney argued that DeGroff's statement was admissible as a statement against penal interest, citing MRE 804(b)(3). We agree that the context clearly indicates that DeGroff was asking sarcastically about not having helped steal $60,000 as a way of reminding defendant that she had in fact helped him steal $60,000, and that this is plain to all persons involved in the motion in limine, including defense counsel. Accordingly, the message was admissible under MRE 804(b)(3) as a statement against penal

interest, as was discussed in the pretrial motion in limine. Defense counsel saw the futility of disputing the exception of MRE 804(b)(3), and again, "[f]ailing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *Ericksen*, 288 Mich App at 201.

Defense counsel also argued against admission of the statements attributed to DeGroff on the basis of relevance, MRE 401, and that her statements were not admissible under MRE 801(d)(2)(E) as statements by a co-conspirator. The trial court rejected those arguments because "the requirement that the statement further the conspiracy has been construed broadly." We agree that DeGroff's statement tended to make the existence of a conspiracy between her and defendant more probable and so it was relevant to defendant's conspiracy charges and admissible as a statement by a co-conspirator.

Therefore, there was no basis to prohibit the admission of the messages, and defense counsel's stipulation was not ineffective assistance, but rather a reasonable response to the trial court's determination to allow the evidence.

## VIII. CELL PHONE WARRANT

On remand, defendant appears to repackage one of his original claims of ineffective assistance of counsel by predicating it on trial counsel's failure to challenge the warrant affidavit on the basis that it did not adequately set forth the relationship between the requested search and the suspected crime—in place of counsel's failure to challenge the resulting warrant itself on the basis of particularity. "When a case is remanded by an appellate court, proceedings on remand are limited to the scope of the remand order." *People v Canter*, 197 Mich App 550, 567; 496 NW2d 336 (1992). In this case, the Supreme Court's remand order called on this Court to "address additional arguments that defendant made in his appeal of right," not to consider any new arguments. *Carson*, ___ Mich at ___; slip op at 31. Likewise, this Court allowed supplemental briefing regarding defendant's "remaining issues," not new issues. *Carson*, unpublished order entered September 4, 2025.

The Supreme Court's lead opinion did not reach the issue, despite having asked the parties to address it, because its conclusion that defense counsel's "performance was not objectively unreasonable" made it unnecessary to do so. *Id*. at ___ n 27; slip op at 31 n 27. However, the Supreme Court's lead opinion noted Judge HOOD's concurrence that "the warrant affidavit failed to adequately set forth a nexus between the item to be seized and the suspected criminal conduct," then stated that "[t]his issue is not currently before the Court." *Id*. at ___ n 9; slip op at 8 n 9. The Supreme Court thereby signaled that it did not regard the nexus argument as germane to the particularization argument. We therefore conclude that this argument is not one of the "additional arguments that defendant made in his appeal of right" that the Supreme Court ordered this Court to consider. *Id*. at ___; slip op at 31. Accordingly, we decline to consider the challenge to the affidavit underlying the warrant for failing to set forth a nexus between the requested search and the suspected crime because defendant was not entitled to raise that new issue on remand.

## IX. DOUBLE JEOPARDY

Finally, regarding defendant's double jeopardy arguments, the Supreme Court did not address this Court's previous opinion or the dissent on this issue because the prosecutor did not appeal the issue. *Id.* at ___ n 1; slip op at 2 n 1. However, the Supreme Court did instruct that if we "reject defendant's additional challenges to his convictions, the proper remedy for the unchallenged double-jeopardy violation is to vacate defendant's convictions of receiving or concealing stolen property and conspiracy to commit that crime." *Id*. As discussed, we have rejected defendant's other claims for relief. In accordance with the Supreme Court's direction, we therefore vacate defendant's convictions of receiving or concealing stolen property and conspiracy to commit that crime. See *Carson*, ___ Mich at ___, n 1; slip op at 2 n 1.

## X. CONCLUSION

For the reasons discussed herein, we vacate defendant's convictions of receiving or concealing stolen property and conspiracy to commit that crime and remand to the trial court for the limited purpose of correcting his judgment of sentence and relaying the correct information to the Michigan Department of Corrections. We otherwise affirm. We do not retain jurisdiction.

/s/ James Robert Redford
/s/ Mark T. Boonstra
/s/ Allie Greenleaf Maldonado